# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**DOCKETED**

SEP 3 0 2002

| | |
|---|---|
| JOHN W. COURTNEY, FRANCES T. LAX, LAWRENCE M. GREEN and IRENE L. KORTAS on behalf of themselves and all others similarly situated | ) ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) No. |
| NEAL T. HALLERAN, WILLIAM C. BRACKEN, MONTE KURS, NELSON L. STEPHENSON, GLEN MILLER, MARC A. WEISMAN, STEVE MANN, WALTER F. RUSNAK, PENNY S. PRITZKER, THOMAS J. PRITZKER, ALVIN DWORMAN, COAST-TO-COAST FINANCIAL CORPORATION, ERNST & YOUNG LLP, and all other unknown Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) |

02C 6926

JUDGE GOTTSCHALL

MAGISTRATE JUDGE LEVIN

## NOTICE OF REMOVAL OF CIVIL ACTION

TO:    THE JUDGES OF THE UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

Defendants Penny S. Pritzker, Thomas J. Pritzker, Alvin Dworman and Coast-to-Coast Financial Corporation (the "Removing Defendants"), by their attorneys, pursuant to 28 U.S.C. §1446, hereby file their Notice of Removal of Civil Action to the United States District Court for the Northern District of Illinois, Eastern Division. All remaining defendants, Neal T. Halleran, William C. Bracken, Monte Kurs, Nelson L. Stephenson, Glen Miller, Marc A. Weisman, Steve Mann, Walter F. Rusnak and Ernst & Young, consent to the removal of this action. In support hereof, the Removing Defendants state as follows:

1. This action was commenced in the Circuit Court for the County of Cook, State of Illinois, Chancery Division and is pending as Case No. 02 CH 1089.

2. This was originally a purported class action for money damages arising out of an alleged violation of the Illinois Consumer Fraud and Deceptive Business Practices Act. The defendants in the original Complaint moved to dismiss said Complaint.

3. On or about August 29, 2002, the Removing Defendants' counsel received a copy of the filed First Amended Class Action Complaint. The Removing Defendants have not been served with summons, but their counsel accepted service as of September 9, 2002.

4. The First Amended Class Action Complaint alleges a violation of the Illinois Consumer Fraud and Deceptive Business Practices Act; Negligent Misrepresentation; and a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. §1962(c).

5. By virtue of the addition of the RICO claim to the First Amended Class Action Complaint, this Court now has original jurisdiction of this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States.

6. This Court also has jurisdiction over the Illinois Consumer Fraud and Deceptive Business Practices Act and Negligent Misrepresentation claims pursuant to 28 U.S.C. § 1367, because they form part of the same case or controversy as the RICO claim.

7. The Removing Defendants file this Notice of Removal of Civil Action in this Court, pursuant to 28 U.S.C. §1446(b), within 30 days from receipt of the First Amended Class Action Complaint.

8.     The Removing Defendants desire to remove this action to the United States District Court for the district in which the action is now pending, the United States District Court for the Northern District of Illinois, Eastern Division.

9.     All remaining defendants consent to removal of this action.

10.     Attached hereto as Exhibit A is a copy of the process and pleadings received by the Removing Defendants in this action to date.

11.     No previous application for the relief sought herein has been made to this or any other court.

12.     After the filing of this Notice of Removal of Civil Action, written notice of such filing will be given by counsel for Defendants, as provided by law, and copies of this Notice will be filed with the Clerk of the Circuit Court of Cook County, Illinois.

Dated:   September 27, 2002                    Respectfully submitted,

PENNY S. PRITZKER, THOMAS J. PRITZKER,
ALVIN   DWORMAN,   COAST-TO-COAST
FINANCIAL CORPORATION

By:_____
                    One of Their Attorneys

Stephen Novack
Timothy J. Miller
NOVACK AND MACEY
303 West Madison Street
Suite 1500
Chicago, Illinois  60606
(312) 419-6900

David W. Haller
COVINGTON & BURLING
1330 Avenue of the Americas
New York, NY  10019
(212) 841-1000

All remaining Defendants, by their counsel, consent to removal of this action.

ERNST & YOUNG LLP

By: _____
                    One of Their Attorneys

Stanley J. Parzen
Edward H. Williams
MAYER, BROWN, ROWE & MAW
190 South LaSalle Street
Chicago, Illinois 60603
(312)782-0600


NEAL T. HALLERAN, WILLIAM C. BRACKEN,
MONTE KURS, NELSON L. STEPHENSON,
GLEN MILLER, MARC A. WEISMAN, STEVE
MANN, WALTER F. RUSNAK

By: _____
                    One of Their Attorneys

Timothy J. Miller
NOVACK AND MACEY
303 West Madison Street
Suite 1500
Chicago, Illinois 60606
(312) 419-6900

David W. Haller
COVINGTON & BURLING
1330 Avenue of the Americas
New York, NY 10019
(212) 841-1000

-4-

## IN THE CIRCUIT COURT OF COOK COUNTY
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| JOHN W. COURTNEY, FRANCES T. LAX, LAWRENCE M. GREEN, and IRENE KORTAS on behalf of themselves and all others similarly situated, | ) ) ) ) ) ) | No. 02 CH 1089<br>Cal. No. 5<br>Hon. Lester D. Foreman |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | **JURY TRIAL DEMANDED** |
| NEAL T. HALLERAN, WILLIAM C. BRACKEN, MONTE KURS, NELSON L. STEPHENSON, GLEN MILLER, MARC A. WEISMAN, STEVEN MANN, WALTER F. RUSNAK, PENNY S. PRITZKER, THOMAS J. PRITZKER, ALVIN DWORMAN, COAST-TO-COAST FINANCIAL CORPORATION, ERNST & YOUNG LLP, and all other unknown Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) | |

**FILED**

**AUG 2 8 2002**

**DOROTHY BROWN**
**CLERK OF CIRCUIT COURT**

## FIRST AMENDED CLASS ACTION COMPLAINT

Plaintiffs John W. Courtney, Frances T. Lax, Lawrence M. Green, and Irene Kortas

("Plaintiffs"), individually and on behalf of themselves and as representatives of all other persons

similarly situated, by and through their undersigned attorneys, for this class action, allege upon

personal knowledge as to their own acts, and as to all other matters upon information and belief,

and upon the investigation made by and through their attorneys, which investigation included,

*inter alia*, a review of public filings, documents and press releases of Superior Bank, FSB,

Hinsdale, the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift

Supervision ("OTS"), state as follows:

<u>Nature of the Action</u>

1. Plaintiffs bring this action as a class action on behalf of themselves and all other

persons who deposited United States currency in Superior Bank, FSB, Hinsdale, Illinois

("Superior Bank"), and who were unable to recoup all or some of their investment following the

financial collapse of Superior. Plaintiffs seek relief from Defendants through this class action

under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section

1962(c), seeking recovery of monetary damages. This action is also brought to recover damages

from certain named Defendants for their violation of the Illinois Consumer Fraud and Deceptive

Business Practices Act, 815 ILCS 505/2, by misrepresenting the scope and effect of FDIC

coverage relating to deposits made by Plaintiffs and the Class. Additionally, the immediate

complaint is brought against Ernst & Young, LLP, ("E&Y"), for aiding and abetting in the

misstating of the financial condition of Superior Bank, upon which Defendants were enabled to

misrepresent the soundness of the Bank and the safety of money deposited into it.

2. Although the full extent of the fraudulent schemes are still being uncovered,

Plaintiffs believe that the Defendants perpetrated a fraudulent pattern or scheme, whereby

Defendants deliberately misused CCFC and Superior Bank and its assets as a means to lure

depositors into the Bank, corruptly funnel money out to the Pritzker and Dworman interests, and

their holding company, Coast-to-Coast Financial Corporation, fraudulently profiting them from

their pattern of malfeasance and impairing Superior Bank's ability to repay depositors of the

class.

2

3. Following their acquisition of Superior Bank for only $42.5 million of their own money, and the receipt of $645 million in benefits from the government (composed of cash, tax credits and loan guarantees), Defendants lured depositors into the Bank, using misstatements of the institution's financial condition, pulled out over $200 million for themselves, and promised to add in another $270 million in cash; but then yanked their support for this Capital Plan, settled with the Federal government by repaying only $100 million cash and the promise to pay $360 million more over 15 years of payments, and left uninsured depositors with $30-45 million in real losses.

4. Further, Plaintiffs, when depositing funds into Superior Banks, were deceived as to the insured status of their deposits. Plaintiffs, conservative and unsavvy depositors looking for safe ways to deposit their money, were solicited to make deposits in excess of $100,000, and they were informed and advised by Superior Bank employees that their deposits would be fully insured by the FDIC, as a result of their being placed *inter alia* into separate certificates of deposit, or into accounts that would be insured in excess of $100,000. In fact, Plaintiffs' deposits were not fully insured because Superior Bank employees made various misleading statements as to the insured status of Plaintiffs' funds, and deceived the Plaintiffs and the Class into depositing funds in excess of $100,000.00. Plaintiffs with multiple accounts were surprised to learn that since these deposits were not recognized by the FDIC as deposits maintained in different rights and capacities these deposits were not insured separately from each other. Other depositors were surprised to learn that special accounts such as individual retirement accounts (hereinafter "IRAs") were not insured in excess of $100,000. Because of Defendants' deceptive acts and practices the Plaintiffs have been damaged thereby.

3

5. On July 27, 2001, the OTS appointed the FDIC as receiver of Superior Bank because of the mismanagement of Superior Bank and the faulty accounting opinions issued by Ernst & Young. The FDIC in turn transferred the insured deposits and substantially all of the assets of Superior Bank to a newly chartered full-service mutual savings bank, Superior Federal. As a result, uninsured deposits, i.e., deposits in excess of one hundred thousand dollars, were not transferred to Superior Federal, resulting in these deposits remaining with the now defunct Superior Bank.

6. Depositors of Superior Bank, including Plaintiffs, whose deposits were not transferred to Superior Federal were damaged in an amount equal to the shortfall in the return of their non-insured deposits.

7. Plaintiffs seek to recover the amounts lost by members of the class through their investment with Superior Bank, together with all other just and deserved damages, costs and reasonable attorneys fees provided under federal RICO provisions.

### Jurisdiction and Venue

8. This court has jurisdiction over this litigation under the Illinois Code of Civil Procedure, 735 ILCS 5/2-209(a)(1) (for the transaction of any business within this State), and (a)(7) (for the making or performance of any contract or promise substantially connected with this State).

9. Venue is proper in this County under the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, as it is the county in which the transaction or some part thereof occurred out of which this cause of action arose.

### The Parties

4

## A.    Plaintiffs

10.    John W. Courtney purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Mr. Courtney's deposits were uninsured and as a result Mr. Courtney was damaged thereby, in an amount in excess of $200,000.

11. Irene L. Kortas purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Ms. Kortas' deposits were uninsured and as a result Ms. Kortas was damaged thereby, in an amount in excess of $100,000.

12. Frances T. Lax purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Ms. Lax's deposits were uninsured and as a result Ms. Lax was damaged thereby, in an amount in excess of $150,000.

13. Lawrence Green purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Mr. Green's IRA deposit was uninsured and as a result Mr. Green was damaged thereby, in an amount in excess of $30,000.

## B.    Defendants

This action is brought against:

14. Neal Halleran was the Chairman, President and Executive Officer of Superior Bank. As Chairman, President and Executive Officer, he failed to reasonably supervise the affairs of Superior Bank, and failed to exercise ordinary care in the discharge of his duties;

5

15. <u>William C. Braken</u> is the Senior Vice President, Chief Financial Officer, Secretary and Treasurer of Superior Bank. Mr. Bracken was responsible for classified asset reporting and verification of the major assets of Superior Bank. Mr. Bracken was replaced on January 22, 2001. As Senior Vice President, Chief Financial Officer, Secretary and Treasurer, he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

16. <u>Monte Kurs</u> is a Director and Executive Vice President of Superior Bank. As a Director and Executive Vice President of Superior Bank he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

17. <u>Nelson L. Stephenson</u> was a Director since 1990 and Chairman since 1997 of Superior Bank. Mr. Stephenson was instrumental in developing and coordinating loan securitization and sales activities. Mr. Stephenson resigned from the Board on January 22, 2001. Mr. Stephenson was instrumental in developing and coordinating loan securitization and sales activities at Superior Bank. As a Director and Chairman he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

18. <u>Glen Miller</u> is a Director of Superior Bank. As a Director he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

19. <u>Marc A. Weisman</u> is a Director of Superior Bank. As a Director he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

20. <u>Stephen Mann</u> is Chairman of Superior Bank, since January 22, 2001. As Chairman

6

he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

21. Walter F. Rusnak is the Chief Financial Officer and Secretary of Superior Bank, since no later than January 11, 2001. As a the Chief Financial Officer and Secretary he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties.

22. Defendant Penny S. Pritzker, personally and in her capacity as chairperson of Superior Bank from 1989 to 1994, and as a director of Coast-to-Coast Financial Corporation through at least July 2001;

23. Defendant Thomas J. Pritzker, personally and in his capacity as a control person of Coast-to-Coast Financial Corporation;

24. Defendant Alvin Dworman, personally and in his capacity as a control person of Coast-to-Coast Financial Corporation;

25. At all times relevant to this Complaint, Defendant Coast-to-Coast Financial Corporation ("CCFC" or the "Holding Company") was, on information and belief, a holding company incorporated in Nevada and operating under the control of Defendant persons Thomas J. Pritzker and Alvin Dworman. Further, Superior Bank was, on information and belief, a national bank, maintaining offices in Chicago, Cook County, Illinois, and subject to the requirements imposed by the Racketeering and Corrupt Organizations Act. Subsequent to the initial filing of this matter, Superior Bank was closed and taken over by the Federal Deposit Insurance Corporation as receiver;

26. Ernst & Young LLP, during all relevant times of the operation of the Bank was the

7

auditor responsible for certifying its financial condition to the Federal government, the public and depositors.

Factual Allegations

A. General Background of Superior Bank Failure

27. In December 1988 Superior Bank (previously known as Lyons Saving Bank, Countryside, Illinois), was acquired by the Coast-to-Coast Financial Corporation for $42.5 million in a Federal Savings & Loan Insurance Corporation ("FSLIC") assisted transaction, making Superior a wholly-owned subsidiary of CCFC. The total government assistance provided to the Pritzker / Dworman / CCFC group was reported by Crain's Chicago Business, October 1 1990, to have been $645 million. CCFC in turn was owned completely and equally by the Pritzker and Dworman interests.

28. The Pritzker and Dworman interests each appointed half of the directors of CCFC. CCFC owned Superior through a shell company, Superior Holdings, Inc. ("SHI"), which was formed in 1998 and became a thrift holding company in 1999. CCFC itself was owned by a multi-tiered and complex set of companies and/or trusts that are controlled by the Pritzkers and Dwormans.

29. According to the OTS Director's testimony before the Senate Committee on Housing, Banking, and Urban Affairs, the Pritzker and Dworman interests formed three holding companies in connection with the Superior Bank venture, Coast-to-Coast Financial Corporation, Coast Partners ("CP"), and UBH, INC. ("UBH"). UBH, is controlled by the Dwormans, while CP is controlled by the Pritzkers. CP and UBH were predominantly shell companies, each representing one family's interest and each with their primary activity being the ownership of 50

8

percent of CCFC. CCFC, in turn, owned 100 percent of Superior as well as several other small

financial services affiliates with operations that complemented Superior. CCFC, UBH, and SP

were all for med for the purpose of acquiring and operating Superior.

30. Superior Bank started with substantial tax benefits and FSLIC guaranteed assets. It is

reported that the Pritzker / Dworman / CCFC group received a package totaling $645 million in

"assistance," by tax benefits, cash, and promissory notes when Lyons thrift was sold to them by

federal regulators in December 1988. The weight of this contribution to the Defendants named

in this complaint is vast compared to the mere $42.5 million that CCFC paid to acquire Superior

Bank, an institution with assets of $1.53 billion at the time (and indeed dwarfs as well, the

payments they are required to repay following Superior's collapse). As stated by a

contemporaneous report in Crain's Chicago Business, January 9, 1989, the government agreed to

wipe the slate clean on Lyons' old problems, allowing the new management to concentrate on

building a healthy thrift.

31. Superior Bank's business strategy hinged on the acquisition of Alliance Funding at

the end of 1992. Alliance Funding is Superior Bank's wholesale mortgage origination division.

32. Superior Bank became a dumping ground for poor-quality, and possibly predacious,

mortgages that brokers could not sell elsewhere.

33. Superior Bank's business plan included periodically securitizing some of the

mortgages while retaining the servicing rights to them; selling the mortgages, for securitization

purposes, for more than they are actually worth but hiding that fact by taking back interest-only

strip receivables and other securitization residuals that can be treated on Superior Bank's balance

sheet as an asset; reporting artificially high net income because of excessive gain-on-sale income

which enables substantial dividend payout as well as the appearance of high capital levels.

34. In 1993, Superior Bank began accumulating assets associated with the retained interests in mortgage securitizations. The balance sheet categories in which these assets are placed accounted for an increasing proportion of Superior Bank's assets. Assets in these categories rose from 20% of Superior Bank's total assets at the end of 1992 to 34% the following year end, to 56% in 1996, to 60% in 1997 and to 65% at the end of 2000. While this percentage has been rising for the industry as a whole, the industry percentage has been much lower. For example, it rose 9% at the end on 1997 to 13% at the end of 2000.

35. In the 1989-99 period Superior Bank paid $188 million in dividends to CCFC which gave Superior Bank's stockholders, the Defendants herein, a substantial return on their initial investment of $42.5 million.

36. Thus, while Superior Bank's actual asset base was being eroded by its questionable loan policies, the Defendants further diminished it by helping themselves to massive amounts of cash, equaling nearly four to five times their original investments.

37. The Defendant stockholders have also gained federal assistance and tax benefits stemming from the transaction of acquiring Lyons Savings / Superior Bank, totaling approximately $645 billion.

38. According to Bert Ely, an independent banking consultant who testified before the Senate Banking Committee, at the end of 1997 Superior Bank had almost seven times as much invested in securitization-related assets as did the rest of the thrift industry. At the same time, at the end of 1997, Superior Bank's recourse exposure related to assets sold, per dollar of capital, was thirty-one times the industry average.

10

39. Especially troubling was Superior Bank's gathering of uninsured deposits. Superior Bank significantly increased its uninsured deposits in 1998, the year it began brokered deposits, as it grew its assets from $1.3 billion to $1.8 billion. Uninsured deposits jumped in 1998 from $93 million to $316 million and then rose to $569 million at the end of 1999 to $572 million on March 31, 2000. After decreasing by $80 million over the next six months, uninsured deposits plunged $440 million, or 89% from September 30, 2000 to March 31, 2001. This drop may reflect a correction of past accounting errors, apparently a frequent problem at Superior Bank, or a run by large depositors. Even more troubling is the increase in Superior Bank's uninsured deposits during the second quarter of 2000 when they rose $9.6 million. This increase could be the result of Superior Bank's aggressive solicitation of deposits, similar to those that Plaintiffs were induced into making just prior to Superior Bank being placed into receivership.

40. According to testimony by the director of the FDIC before the Senate Committee on Banking, Housing and Urban Affairs, September 11, 2001, a principal cause of Superior Bank's failure was the decision of its board and management to book high levels of retained interests related to the securitization of subprime assets. The retained interests were deeply subordinate, at a first loss position, to more senior claims on the more than $4 billion in subprime loans that Superior Bank sold to investors. Over the course of several years Superior Bank's retained interests represented an increasing multiple of its Tier 1 capital.

41. Tier 1 capital includes equity, noncumulative perpetual preferred stock, and minority interest in consolidated subsidiaries, while Tier 2 includes the allowance for loan and lease losses, other preferred stock and subordinated debt that has an original weighted average maturity of at least five years.

11

42. Retained interests, sometimes referred to as "residuals," represent an accounting recognition of immediate gains on the sale of assets in the course of securitization activities.

43. Securitizing loans is a process by which a pool of loans is divided into securities by their differing levels of credit quality and then sold to investors. Superior Bank like many issuers, held onto the securities with the greatest amount of risk or otherwise provided significant credit enhancement for the less risky securities. These securities with the greatest risk included interest-only or I/O strips, spread accounts, and cash collateral or over collateralization accounts, and are collectively known as "residuals" because they receive the last cash flows from the loans.

44. In a securitization, the subprime lender sells packages of loans to another party or institution but often retains as an asset the right to receive a portion of the cash flows expected from the loans. The expected value of these cash flows is generally referred to as retained interest.

45. Under Generally Accepted Accounting Principals ("GAAP") the fair value of these expected future cash flows are recorded on balance sheets as assets in the form on interest-only strips receivable, spread accounts, or other rights, sometimes referred to as retained interests.

46. Retained interests serve as credit enhancements for the securitized assets. As such, these assets are considered to be recourse exposures that subject the institution to risk of loss on the transferred assets. As a result under the current rules, risk-based capital is required for the securitized assets that are deemed to be transferred with recourse due to the retention of these retained interests.

47. <u>OTS & FDIC Concerns Arise</u>. As an insurer, the FDIC's interest in the situation at Superior was heightened in December 1998, following their completion of an offsite review of

12

the Bank, based on September 30, 1998 financial information. According to the FDIC Director's statement to the Senate Banking Committee, the FDIC's offsite review noted significant reporting differences between the Bank's audit report and its quarterly financial statement to regulators.

48. During 1999 both the OTS and the FDIC began having serious concerns about Superior Bank and initially focused their attention on an inadequate asset classification system which led to inaccurate loss reserves and regulatory accounting, as well as on the deteriorating auto portfolio.

49. The January 2000 examination of Superior Bank revealed many weaknesses including extremely high concentrations of high-risk assets, inadequate management and controls, inaccurate reporting, and lack of documentation and support for retained interest valuations.

50. As a result of OTS's examination report, the OTS sent to Superior Bank's board of directors on July 5, 2000, a notice of deficiency requiring Superior Bank to submit a safety and soundness compliance plan pursuant to section 39 of the Federal Deposit Insurance Act. The notice required Superior Bank to take the following action:

- develop procedures for analyzing the ongoing fair market value of the institution's residual assets;

- obtain periodic independent valuation of a sample of receivables;

- develop a plan to reduce the level of residual assets;

- revise the institution's automobile lending policy and establish performance targets for its automobile lending operation; and

13

- develop a revised Allowance for Loan and Lease Losses ("ALLL") policy and
  maintain adequate loan loss reserves.

51. Due to OTS's concerns regarding the concentration of assets in residuals, Superior Bank's Board ceased securitizing loans at the thrift and instead sold newly originated loans to its holding company. This stopped the growth of residuals at Superior.

52. On July 7, 2000, OTS forwarded a supervisory letter to Superior Bank officially notifying Superior Bank and its Board of OTS's designation of Superior Bank as a problem institution. The notice from OTS prohibited asset growth, except in the amount of interest on deposits, and placed other restrictions on Superior Bank.

53. Superior's board of directors submitted a compliance plan to OTS on August 4, 2000. The board's response indicated that procedures were being developed and implemented, with assistance of E&Y to value the institution's residual assets.

54. According to the FDIC Director's statement to the Senate Banking Committee the FDIC in August 2000 noted that estimated future cash flows were not discounted to present value for some retained interests which had the potential of significantly overstating the value of the retained interests, which had the potential to of significantly overstating the value of the retained interests. In late August 2000 the FDIC and the OTS raised the issue with E&Y who agreed to revisit the issue as part of their upcoming audit of Superior's June 2000 fiscal year-ending financial statements.

55. On October 16, 2000 an OTS examination of Superior Bank was begun which continued into early 2001 because of significant problems which were uncovered during the examination. The OTS's examination disclosed that Superior Bank's financial statements for

June 30, September 30, and December 31, 2000 contained significant errors. The fair market value analysis of the residual assets had not been completed. Management also failed to implement several of OTS's January 2000, examination instructions and continued to delay required adjustments to the financial statements during the course of the field visit.

56. In October 2000 Ernst & Young issued their audit of Superior Bank for fiscal year ending June 30, 2000. OTS and FDIC conducted a review of not only the audit but also the supporting documentation.

57. During this time OTS and FDIC accountants had meetings and discussions with E&Y and Superior Bank concerning whether GAAP had been appropriately applied to the over collateralization accounts.

58. The OTS Director testified before the Senate Banking Committee that, on November 15, 2000, OTS informed Superior that their residual assets were significantly overstated at June 30 due to the absence of valuation procedures and the use of incorrect accounting treatment. The examiners concluded that Superior Bank, notwithstanding representations to the contrary, was not accounting for the residual assets in compliance with Statement of Financial Accounting Standards, No. 125 ("SFAS 125"). SFAS 125 is "Accounting for Transfers and Servicing of Financial Assets and extinguishment of liabilities" issued by the Financial Accounting Standards Board.

59. The OTS director concluded that, in connection with the bank's failure to comply with SFAS 125, Superior had overstated the value of its residual assets when it failed to properly recognize the impact of timing delays in the receipt of cash flow in the over collateralization assets within the residual retained on its books. The OTS Director also concluded that E&Y

failed to object to this improper reporting.

60. Further, this aforementioned auditing error caused Superior Bank to report inflated assets, earnings and capital. Combined with other adjustments the examiners estimated an appropriate write-down of the residuals might exceed $200 million.

61. In addition, according to the head of OTS's Senate testimony, OTS's and FDIC's October 2000 field visit disclosed that Superior's management and board of directors failed to take certain actions to ensure that the books and records accurately reflected true financial conditions of the institution. These actions primarily involved the failure to recognize various write-downs applicable to the institution's automobile loan operations.

62. On December 19, 2000 OTS and FDIC met with Superior Bank and E&Y to discuss the accounting treatment of the residual assets. Also present at this meeting was a consultant hired directly by the holding company, CCFC. OTS advised Superior Bank that the accounting treatment was incorrect and a significant adverse valuation adjustment to these assets was necessary. Superior Bank management and E&Y continued to disagreed with OTS and the FDIC.

63. The FDIC Director testified before the Senate Banking Committee that, between October and December, 2000, in various correspondence, the local E&Y office attempted to support its position that the future estimated cash flows should not be discounted. OTS and FDIC objected, and in late December OTS insisted that the issue be raised with E&Y's national office.

64. On January 11, 2001 a meeting was held among representatives from Superior's management, OTS FDIC, Superior's holding company, outside consultants, and E&Y about the discounting issue. Also on this date an E&Y's national review official acknowledged that the

accounting treatment applied by E&Y to the residual assets was incorrect, although E&Y did not

agree as to the amount of the adjustment. The revaluation later resulted in a write-down of the

residual assets in the amount of $270 million.

65. <u>Direction to Submit Prompt Corrective Action Plan</u>. OTS Director Ellen Seidman

testified before the Senate Banking Committee that, on February 12, 2001 Superior Bank's board

was directed to submit a Prompt Corrective Action ("PCA") Capital Restoration Plan by mid-

March of 2001. On February 14, 2001 OTS issued a PCA directive based upon OTS's

determination that the institution was "significantly undercapitalized." Further, Superior Bank's

holding companies, SHI and CCFC, consented to the issuance of a cease and deist order, and to

fund an escrow account at Superior Bank in an amount not to be less than $5 million at all times.

This account was designed cover any losses from Superior Bank's weekly sale of mortgage

loans.

66. The February, 2001 PCA required significant operating changes as well as a major

capital infusion, and did so even before the Bank reported itself to be significantly

undercapitalized, according to testimony by the OTS Director before the Senate Committee on

Banking, Housing, and Urban Affairs.

67. On March 14, 2001 Superior Bank submitted the first version of a Capital Plan. On

that same day, OTS and FDIC examiners determined that the institution's low capital level,

concentration of high risk assets, and large operating losses required an immediate capital

infusion for Superior to become a viable institution.

68. Plaintiffs believe that, due to the problems with the erroneous accounting

interpretations, wholly accurate audit and financial information on Superior Bank had not been

available for at least the past three fiscal years, since approximately June 30, 1998.

69. According to a report by the OTS Director, for example, the financial statements accompanying the June 2000 independent audit by E&Y do not accurately reflect the fair market value of Superior's residual assets under GAAP. E&Y was not retained by Superior to perform the Bank's audit work for the year ended June 30, 2001.

70. Overall, according to an August 7, 2001 Washington Post article, Federal regulators concluded that bad lending practices, improper bookkeeping and improper oversight by the bank company's owners and directors were the predominant causes of the failure of the $2.3 billion Superior Bank, which specialized in making high-interest mortgages and automobile loans to low-income borrowers nationwide.

B. Facts Primarily Supporting Consumer Fraud Allegations

71. Courtney Deposits. On or about May 12, 2001, and at various subsequent times thereafter, Mr. Courtney met with Superior Bank sales assistant, Margaret Figus, at the Superior Bank branch located at 9161 W. 151st Street, Orland Park, Illinois. Ms. Figus, while reading from or referring to a Superior Bank document, informed Mr. Courtney that Superior Bank was in a very sound and stable financial condition. This was an untrue statement at the time it was made. Ms. Figus also advised Mr. Courtney as to how to title his certificates of deposit into three separate accounts so that they would each be insured for $100,000.

72. Kortas Deposits. On or about September 11, 1999 Ms. Kortas met with Superior Bank sales associate Cathy Halvey, at the Superior Bank branch located at 144 S. Euclid Ave., Park Ridge, Illinois. Ms. Kortas, purchased on that date a certificate of deposit. Ms. Kortas was informed that by placing different account names on her certificates of deposit that each

18

certificate of deposit would be fully insured up to $100,000.00. Ms. Kortas subsequently

purchased seventeen certificates of deposit from Superior Bank.

73. Green Deposits. On or about May 7, 2001, Mr. Green met with Superior Bank

Personal Banker Mark Noyszewski at the Superior Bank at 8963 Golf Road, Niles, Illinois. Mr.

Green purchased on that date an Individual Retirement Account in the amount of $130,040.79.

Mr. Green was informed by Noyszewski that this account was FDIC insured. Were it not for this

guarantee, Mr. Green would not have purchased the account.

74. Lax Deposits. On or about May, 1997, Mrs. Lax, and at various times subsequent to

said date, met with Superior Bank sales assistant, Jill Amudsen and her supervisor Ernie

Hernandez, at the Superior Financial Center located at 1418 Waukegan Road, Glenview, Illinois.

Ms. Amudsen and Mr. Hernandez each assured Mrs. Lax that her certificates of deposit would be

completely insured provided that she titled her certificates of deposit to include a third party and

that no one certificate of deposit exceeded $100,000. Mrs. Lax subsequently purchased three

certificates of deposit totaling $250,000. Ms. Amudsen or Mr. Hernandez periodically contacted

Mrs. Lax to obtain her approval for opening new certificates of deposit upon the maturation of

older investments. But for Superior's assurances of complete safety of her investments, Mrs. Lax

never would have invested in Superior's certificates of deposit.

75. The Defendants, as officers and directors of Superior Bank, knowingly gave or

caused to be given, false information to sales associates with the knowledge that this information

would be used by Superior Bank employees when discussing accounts with consumers.

76. The Defendants, as officers and directors of Superior Bank, have a duty to

supervise their employees and to train them in their duties. Defendants failed to properly train

19

and supervisor their sales associates as to FDIC regulations governing insured deposits.

77.  The Defendants knowingly caused or negligently failed to prevent Ms. Figus from making false statements to Mr. Courtney which he reasonably believed and which he relied upon to his determent.

78.  The Defendants knowingly caused or negligently failed to prevent Ms. Halvey from making false statements to Ms. Kortas which she reasonably believed and which she relied upon to her determent.

79.  The Defendants knowingly caused or negligently failed to prevent Mr. Noyszewski from making false statements to Mr. Green which he reasonably believed and which he relied upon to his determent.

80.  The Defendants knowingly caused or negligently failed to prevent Ms. Amudsen and Mr. Hernandez making false statements to Ms. Lax which she reasonably believed and which she relied upon to her determent.

81.  The Defendants, as officers and directors of Superior Bank, were controlling persons. By reason of their positions with Superior Bank they were able to and did, directly or indirectly, in whole or in material part, control Superior Bank's pattern and practice of deceptively concealing and misrepresenting the amount of FDIC insurance coverage available on deposits.

82.  By reason of their positions with Superior Bank, the Defendants had access to internal bank documents, reports and other information.  The Defendants also attended Superior Bank management and/or board of director's meetings.  As a result of the foregoing, the Defendants were responsible for Superior Bank's business decisions and practices, described herein.

83. <u>Closure of Bank</u>. On information and belief, and based on testimony by the FDIC director, at the time Superior Bank was closed by the Office of Thrift Supervision, Superior Bank had about $49 million in uninsured deposits held by around one thousand depositors. Superior Bank suffered as a result of an unreasonable high risk business strategy which focused on the generation of significant volumes of subprime mortgages and automobile loans for sale on the secondary market. The OTS found that Superior Bank suffered from poor lending practices, improper record keeping and accounting, and ineffective board management supervision.

84. As detailed by the OTS Director to the Senate Banking Committee, Superior Bank became critically undercapitalized due largely to incorrect accounting treatment and aggressive assumptions for valuing residual assets. Because of the Defendants' mismanagement and improper accounting and record keeping, the OTS found that Superior Bank could not transact business in a safe and sound manner. As a result of the OTS's findings, the OTS determined that closure of Superior Bank and the appointment of the FDIC as receiver was necessary to protect the interests of the Superior Bank's insured depositors.

85. The FDIC asserted in its February 6, 2002 audit report that an over-reliance existed on the owners ability to provide additional support if needed. The Defendant owners could have, but chose not to, fulfill that obligation and correct that failure of the Bank.

86. On or about December 10, 2001 the Pritzkers and Dwormans agreed to settle with the FDIC and OTS for a repayment of $460 million, of which only $100 million had been paid in cash, and the remaining $360 million being paid over a fifteen year period.

87. A portion of the proceeds of the aforementioned settlement has been distributed to persons who were issued received certificates on a quarterly basis over a fifteen year period.

Receiver Certificates are claims for uninsured deposits. It is believed that this $460 million settlement will still fall substantially short of the amount necessary to satisfy the losses incurred by the Plaintiffs and the putative Class members.

88. As of September 2001, according to testimony by the OTS director, since 1996 there have been only three thrift failures other than the Superior collapse at issue in the present Complaint.

C. Facts Primarily Supporting Racketeering and Corrupt Organization Act Allegations.

89. Over relevant periods, the Defendants engaged in a series of acts by which capital was sucked out of the Bank and into the holding company, and concealed the Bank's unsoundness from regulators, the public, and potential and current depositors.

90. In 1996, according to "The FDIC and Recent Bank Failures," a report by the American Institute for Economic Research, dated September 10, 2001, Defendant Dworman allegedly executed and received a loan of $100 million from CCFC funded by dividends that Superior paid to CCFC. The dividends paid to fund this loan effectively sucked the remaining capital out of Superior, and eliminated the Defendant owners' capital cost regarding the high-risk subprime lending strategy.

91. An August 7, 2001 report by Kathleen Day, Washington Post Staff Writer, suggests that the CCFC loan to Dworman was valued at $130 million. Dworman reportedly stated that the Pritzker family suggested that Dworman take the aforementioned loan, while the Pritzker family said that Dworman asked for the loan in 1996 because he was in financial trouble.

92. Also in 1996, according to the FDIC Office of Inspector General Report "Issues Related to the Failure of Superior Bank," February 6, 2002, the holding company CCFC made a

22

$70 million loan to UBH, Inc., one of the holding companies that owned CCFC. According to a promissory note dated March 29, 1996, partial interest payments were to be made monthly through July 1997. The remainder of the interest and all of the principal was to be paid in one installment on December 31, 1999. The February 6, 2002 FDIC Audit Report found no evidence that any payments were made on this loan.

93. OTS officials also questioned whether UBH, Inc., ever made any payments to the holding company for the aforementioned loan. According to the February 6, 2002 "Material Loss Review of Superior Bank," Dept. of Treasury Inspector General, in March 19, 2001, the FDIC determined that this money could have been made available to Superior when its capital levels fell shortly after the loan payment was due. Since the terms and conditions of the loan are somewhat vague, and no loan payments were apparently made, it raises the question of whether this was actually another dividend payment rather than a loan.

94. The FDIC ultimately concluded that Superior bank had grossly inflated earnings from 1996 through 1999. The owners of Superior, the Defendant's named herein, received over $200 million in dividends during the 1990s, most of which occurred between 1995 and 1999.

95. According to the prepared testimony of Bert Ely before the Senate Banking Committee, Superior Bank often filed erroneous Thrift Financial Reports (hereinafter "TFR's") with the OTS. There are numerous inconsistencies and un-reconciled differences in Superior Bank's financial state that stem from the filing of amended TFRs. For example, until March 31, 2000 Superior had reported no interest-only strip receivables. Then Superior Bank reported $644 million in interest-only strips which accounted for 28% of its total assets. Previously, those interest-only strips appear to have been classified on Superior Bank's TFRs as "mortgage

23

derivative securities."

96. A far more egregious reporting incident occurred for the fourth quarter of 2000. Superior Bank's initial TFR for December 31, 2000 reported that it had $255.7 million in capital on that date, for an 11.2% leverage capital ratio. However, in the Spring of 2001, Superior Bank filed an amended TFR showing just $37.9 million of capital, for a capital ratio of just 1.8 % which placed Superior Bank in the critically undercapitalized category at the end of 2000.

97. Further, while Superior distributed more that $200 million in dividends to its holding company, $12.5 million of this figure was not reported on Superior's TFRs, according to the FDIC February 6, 2002 report.

98. According to the February 6, 2002 report by the Department of Treasury Inspector General, in March 19, 2001 OTS conducted a safety and soundness examination. The examiners uncovered a series of transactions involving Superior Bank and CCFC where the holding company benefitted from terms and conditions that were not at arm's length and that were detrimental to the bank. Examiners determined that these transactions totaled $36.7 million, a receivable owed to Superior by CCFC. These unsecured transactions represented a transaction with affiliates violation, and violated various statutes and regulations.

99. In compliance with an OTS corrective plan, Superior stopped securitizing loans on June 30, 2002. Even so, Superior continued to originate subprime loans. Instead of securitizing the loans and retaining the residual assets, Superior sold the loans it originated to its holding company. CCFC then securitized the loans and retained the residual assets.

100. Other ways capital was sucked out of Superior Bank info CCFC. According to the FDIC February 6, 2002 report, OTS examiners later discovered that during the fourth calendar

24

quarter of 2000 Superior sold these loans at a fixed price to CCFC. The loans were sold to CCFC at less than fair market value. CCFC then quickly resold the loans and reaped a $20.2 million gain on the transaction. The bulk of the $36.7 million balance represented profits from the sale of loans by CCFC that were owed to Superior. The OTS listed this receivable as a violation between Superior and CCFC, for engaging in transactions that were not at arm's length and for extending unsecured credit to an affiliate. This transaction was deemed by OTS to be violative of various federal regulations through the sale of assets to an affiliate at a price less than fair market value. Further, OTS examiners uncovered a series of transactions involving the bank and its holding company where the holding company appeared to benefit from terms and conditions that were not at arm's length and that were detrimental to the bank.

101. Plaintiffs believe that the OTS determined that the aforementioned transaction violated various federal regulatory provisions believed to include, *inter alia*, 12 CFR Section 563.41(c), 12 CFR Section 563.41(e), and 12 CFR Section 563.42, which requires that transactions with affiliates to be on terms and under circumstances that are substantially the same, or at least as favorable to the association, as those prevailing at the time for comparable transactions with non-affiliated companies.

102. On March 30, 2001, as reported in the "Material Loss Review of Superior Bank" and elsewhere, CCFC made a temporary capital infusion into Superior Bank in order to keep the institution above the "critically undercapitalized" PCA category pending completion of the Capital Plan. CCFC transferred to Superior Bank its beneficial interest in residual assets in seven securitization pools with an estimated value of $81 million.

103. Further, on May 7, 2001 OTS demanded that CCFC repay the $36.7 million

25

receivable owed Superior Bank. CCFC refused to repay until the Capital Plan was implemented.

104. According to the OTS Director's testimony before the Senate Committee on Housing, Banking, and Urban Affairs, on May 24, 2001 OTS approved the Capital Plan submitted by Superior Bank on March 14, 2001. The PCA Capital Plan essentially provided for the sale of the Superior Bank's retained interest portfolio to an entity to be owned, but not controlled by the Pritzkers, to be known as Newco. The Capital Plan included a cash infusion of $270 million by the Pritzkers and Dwormans. The Pritzkers would contribute $210 million and the Dwormans would contribute $50 million, with CCFC itself contributing $10 million. OTS also received joint and several guarantees of up to $100 million by eight of the various holding companies and several family trusts. The FDIC chief testified before the Senate Committee inquiring into the Superior Bank failure that it appeared that the Bank would have an opportunity to begin to stabilize if the capital plan was implemented as presented.

105. According a December 11, 2001 report in the Washington Post by staff writer Kathleen Day, the Pritzker and Dworman interests were blaming each other for the bank's problems during the time leading up to the tentative agreement regarding a rescue plan that would satisfy regulators.

106. Superior Bank was apparently working toward the implementation of the Capital Plan, until July 16, 2001 when the Pritzkers sent a letter to the OTS informing the OTS that they no longer believed in the projections used in developing the Capital Plan and would not support it, meaning, that they would not fulfill their obligations under the Plan. The Pritzkers advised OTS that they did not believe that the capital plan would work and therefore withdrew their support for or their commitment to the $270 million recapitalization plan.

26

107. The OTS's July 21, 2001, response to the Pritzker's July 16 letter indicated that, even under the most extreme case set forth in the Pritzker's modified projections, it appeared that their concerns would not be an issue until many years later. OTS's correspondence concluded with the demand that the Pritzkers fulfill their obligations under the capital plan.

108. When the owners failed to implement the Capital Plan in July 2001, OTS deemed Superior's equity to be insolvent by $125.6 million. The adjustments were necessitated after OTS and FDIC examiners determined earlier in the year that Superior had overstated the value of residual assets by $150 million due to overly optimistic assumptions used in the valuation models.

109. Another material adjustment precipitating insolvency arose from the aforementioned $36.7 million receivable due from CCFC. In the second half of 2000, Superior sold loans to the holding company. CCFC, in turn, sold the loans at a higher price than that paid to Superior. After deeming the transaction improper, OTS required CCFC to repay Superior, but payment was delayed reportedly due to a cash shortage at CCFC. Ultimately, recouping the $36.7 million had become dependent on the defendants implementing the Capital Plan, which did not materialize. This led to Superior's placement in the "critically undercapitalized" PCA category.

110. Further, based upon information in the February 6, 2002 "Material Loss Review of Superior Bank," Dept. of Treasury - Inspector General, plaintiff believes, that CCFC was deemed in violation of 12 CFR Section 563 when it sold those loans bought from Superior at a higher price than paid to Superior.

111. On July 25, 2001 Superior's Board of directors executed an Agreement and Consent

27

to Appointment of a Conservator or Receiver.

112. The FDIC February 6, 2002 Audit Report concluded that the owners' unwillingness to recapitalize the institution, coupled with the previously alleged accounting write-downs and losses, resulted in the OTS closing Superior on July 27, 2001.

113. Overall, CCFC conducted itself in a manner that demonstrated a pattern of deliberate deception and malfeasance. According to the February 6, 2002 FDIC report, CCFC was criticized by OTS in nearly every holding company examination report for activities such as dilatory filings of required regulatory reports. In at least one instance, in 1995, the delayed receipt of annual financial statements from CCFC substantially delayed completion of OTS examinations for both the thrift and the holding company.

114. Although Superior's payment of dividends to its holding company and the Defendants herein has ostensibly appeared to be within federal guidelines at the time they occurred, based on the misstated financials, the dividends paid were in fact excessive according to the FDIC's February 6, 2002 report . The FDIC found that had Superior's residual interests and OC accounts been properly valued, these large dividend payments would have or should have had to be substantially reduced or possibly even eliminated. For example, according to the FDIC report, in the fiscal year ending June 30, 1994, the holding company received dividends from Superior totaling more than $20 million, an amount representing 146.6 percent of Superior's $13.7 million net income for the fiscal year. Further, because of losses sustained by Superior in earlier years, that dividend amount also represented 116 percent of Superior's total net income *since inception*. These excessive dividend payments to the Defendant holding company thus led to the further depletion of Superior's capital.

115. These and possibly other multiple misstatements, omissions, delays, and reneged commitments constitute numerous instances of financial institution fraud (18 U.S.C. § 1344), and consumer fraud (upon depositors). Further, where these or other fraudulent acts were done by or through the United States mail, or were also mail and wire fraud (18 U.S.C. §§ 1341 and 1343, respectfully), this constituted operation of Superior Bank and CCFC by or through a pattern of racketeering.

D. Facts Primarily Supporting Allegations Against Ernst & Young.

116. According to a July 28, 2001 Washington Post Article, the head of supervision for the OTS stated that the problem at Superior became as bad as it did because regulators relied on the accuracy of statements by E&Y, but that by the spring of 2001 regulators realized that the Bank's books had been maintained in a sloppy and improper manner. This questionable bookkeeping backed by the accounting firm led regulators to force E&Y to restate the Bank's earnings.

117. According to testimony by the Director of OTS before the Senate Committee on Banking, Housing, and Urban Affairs, September 11, 2001, the losses at Superior were so high largely because of the Bank's concentration in residuals. She stated that the concentration in residuals at Superior was exacerbated by a faulty accounting opinion by the Bank's external auditors that caused capital to be significantly overstated, and by management and board recalcitrance in acting on regulatory recommendations, directives and orders.

118. The OTS director testified before the Senate Committee on Housing, Banking, and Urban Affairs that OTS's experience with Superior highlights a number of accounting and financial reporting issues. Specifically, she expressed that the independent role of external

auditors and their training and experience with complex financial instruments and transactions are issues raised by the OTS's experience with Superior.

119.  According to a February 12, 2002 Knight Ridder/Tribune article, E&Y also received non-audit consulting fees from Superior which totaled at least twice as much as the fees it received for its accounting services.  The source for this information, the inspector general for the FDIC, stated that this was a direct conflict of interest.

120.  Further, on information and belief, both the Pritzkers and Dwormans have blamed the Bank's collapse in large part on the accountants, E&Y, whose reports they say they relied upon.

121.  E&Y owed a duty of accurate reporting that runs to actual and potential depositors of the Bank.

E. Class Action Allegations.

122.  The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are approximately one thousand members of the Class, person and entities who had uninsured deposits with Superior Bank at the time the OTS appointed the FDIC as Receiver, whose losses presently appear to be $33 million to $46 million.

123.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act and/or the Racketeering Influenced and

Corrupt Organizations Act as alleged herein;

      a.      Defendants participated in and pursued a common course of conduct complained herein;

      b.      Defendants caused to be misrepresented and/or omitted material facts about the insured status of deposits;

      c.      Defendants knowingly and recklessly omitting and/or misrepresenting material facts regarding the insured status of deposits;

      d.      Defendants participated in, directly or indirectly in the conduct of an enterprise's affairs, or were associated with, or otherwise constituted an enterprise;

      e.      Defendants participated in said enterprise through a pattern of racketeering activity;

      f.      Members of the class suffered injury to their business or property by reason of the pattern of racketeering activity;

      g.      Members of the Class sustained damages and, if so, what is the proper measure of damages.

124. Plaintiffs' claims are typical of the claims of the members of the Class because the Plaintiffs and members of the Class sustained damages arising out of Defendants' wrongful conduct in violation of state law as complained of herein.

125. Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel competent and experienced in class actions. Plaintiffs have no interests, antagonistic to or in conflict with, those of the Class.

31

126. A class action is superior to other available methods for the fair and efficient adjudication of the controversy since joinder of all members of the Class is impracticable. Furthermore, because the damages suffered by the individual Class members may be relatively small, the expense and burden of individual litigation makes it impracticable for the Class members individually to redress the wrongs done to them. Plaintiffs anticipate no difficulty in the management of this action as a class action.

CAUSES OF ACTION

COUNT I<br>
<u>Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2</u>

This count is alleged against Defendants Neal T. Halleran, William C. Bracken, Monte Kurs, Nelson L. Stephenson, Glen Miller, Marc A. Weisman, Steven Mann, and Walter F. Rusnak.

127. Plaintiffs incorporate by reference and reallege each and every allegation in paragraphs 1 through 126, *supra*, as if fully set forth herein.

128. At all relevant times, there was in full force and effect in Illinois the Consumer Fraud Act, 815 ILCS 505/1, *et seq.*

129. Section 2 of the Consumer Fraud Act, 815 ILCS 505/2 provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby

32

declared unlawful whether any person has in fact been mislead, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

130. The Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, provides at Section 2, 815 ILCS 510/2, in pertinent part:

§ 2.  A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
* * *
(12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

* * *

131. Section 10a of the Consumer Fraud Act, states, in pertinent part:

(a)  Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper. Proof of public injury, a pattern, or an effect on consumers generally shall not be required.
* * *
(c)  Except as provided in subsection (f), (g) and (h) of this Section, in any action brought by a person under this Section, the Court may grant injunctive relief where appropriate and may award, in addition to the relief provided in this Section, reasonable attorney's fees and costs to the prevailing party.

132. <u>A deceptive act or practice.</u> Defendants knowingly or recklessly participated or assisted in the deceptive act or practice by knowingly or recklessly misinforming Superior Bank's employees of the requirements of FDIC insurance coverage.

133. Certain Defendants who were or are officers and directors of Superior Bank, are

33

responsible for establishing, supervising, directing, and controlling the business activities, practices and policies of Superior Bank including;

a. the policy and practice of misrepresenting the amount of FDIC insurance coverage on deposits; and

b. the policy and practice of inducing Plaintiffs and the Class to deposit funds in excess of FDIC insurance coverage.

134. Intent on the Defendant's part that the Plaintiffs rely on the deception. Defendants statements were intended to be relied upon by Plaintiffs and the Class.

135. Defendants' wrongful conduct, as alleged herein, occurred in trade and commerce and caused damages to Plaintiffs and the Class.

136. Certain Defendants, as officers and directors of Superior Bank, were charged with performing their duties in good faith and with the degree of care that an ordinarily prudent person serving as an officer or director of a federal savings bank would use under similar circumstances. In performing their duties Defendants were required to reasonably train and supervise Superior Bank employees as to FDIC regulation governing insured accounts.

137. As detailed herein, Defendants have thus violated the Consumer Fraud Act.

## COUNT II
### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. 1962(c)

This count is alleged against Defendants Penny S. Pritzker, Thomas J. Pritzker, Alvin Dworman, and Coast-to-Coast Financial Corporation, and any other unknown Defendants.

138. Plaintiffs incorporate by reference and reallege each and every allegation in paragraphs 1 through 137, *supra*, as if fully set forth herein.

139. At all times relevant to this Complaint, the Racketeer Influenced and Corrupt

34

Organizations Act, 18 U.S.C. § 1961, et. seq., was in full force and effect.

140. At all times relevant to this Complaint, Defendants Penny S. Pritzker, Thomas J. Pritzker, and Alvin Dworman are each 'persons' within the meaning of 18 U.S.C. § 1961(3).

141. At all times relevant to this Complaint, the group of defendants, individually and acting together with CCFC and Superior Bank, constituted an 'enterprise' as that term is defined in 18 U.S.C. § 1961(4) (hereafter referred to as the "group enterprise"), whose activities were involved in or affected interstate commerce, and whose business utilized the United States mail, and whose business was conducted by each of the group of defendants, jointly and severally, by a means of a pattern of racketeering activities as that term is defined in 18 U.S.C. §1961(l).

142. At all times relevant to this Complaint, CCFC and Superior Bank were each an "enterprise" within the meaning of 18 U.S.C. §1961(4), whose activities affect interstate commerce, and whose business was conducted by each of the individual defendants by means of a pattern of racketeering activities, as that term is defined in 18 U.S.C. §1961(l).

143. The enterprises of CCFC and Superior Bank each acted with other entities or persons as part of an associational enterprise that is or was engaged in racketeering activity, or alternatively is or was acting alone as the perpetrator of racketeering activity.

144. Defendants persons Penny S. Pritzker, Thomas J. Pritzker, and Alvin Dworman, along with CCFC, associated and otherwise worked in cooperation with each other in various combinations, actions, and responsibilities, to conduct or participate in the conduct of the affairs of each of the enterprises (each of the group, Bank and Holding Company enterprises, viewed separately) through a pattern of racketeering activity, part of which involved the scheme to defraud Plaintiff depositors.

35

145. The described acts of racketeering activity constitute a 'pattern of racketeering activity' as defined in 18 U.S.C. §1961(5).

146. All of the allegations contained herein occurred after the effective date of the various RICO enactments, October 15, 1970. Further, on two or more occasions, the various allegations contained herein occurred within ten years after the commission of a prior act of racketeering activity.

147. The Dworman and Pritzker interests, and CCFC, all permitted Superior Bank to be conducted by management by a pattern of racketeering activity. This included fraud in the inducement, luring Plaintiff depositors to place assets into Superior bank which was known to be insolvent. The Defendants further displayed a pattern of pulling money out of Superior Bank, thereby depleting its surplus capital, while simultaneously enticing Plaintiffs to invest capital in the failing thrift, all the while concealing both those transactions and the Bank's impaired condition, constituting bank fraud and consumer fraud, from depositors and regulators.

148. The Plaintiff Class Members have suffered injury to their business's or property by reason of the Defendant's myriad racketeering activities.

149. The Defendants are liable to the Class under RICO in that they carried out a scheme whereby they lured the Plaintiffs to deposit funds in the bank, intentionally or recklessly contributed to the Bank's eventual insolvency, causing the Bank's inability to reimburse Plaintiff depositors for their losses. The February 2002 report to the United States Senate Committee on Banking, Housing, and Urban Affairs by Thomas J. McCool on behalf of the United States General Accounting Office, concluded that primary responsibility for the failure of Superior Bank resides with its owners and managers. The Defendant owners received over $200 million in dividends during the 1990's, most

36

of which occurred between 1995 and 1999, according to the 2002 FDIC analysis. Finally, only when the owners of Superior Bank, the Defendants named herein, refused to contribute additional capital to their undercapitalized bank, the regulators were forced to place Superior into receivership.

### Count III – Negligent Misrepresentation

This count is alleged against Defendants Ernst & Young.

150. Plaintiffs incorporate by reference and reallege each and every allegation in paragraphs 1 through 149, *supra*, as if fully set forth herein.

151. The sole objective of an external audit is for the auditor to issue an opinion regarding the institution's financial statements, thereby concluding whether the financial statements of the audit client are prepared in accordance with GAAP.

152. In filing audits of the Bank's financial condition, Ernst & Young owed a duty to depositors and potential depositors because Ernst & Young knew or should have known that their misstatements of Superior Bank's financial condition would be used by the Bank's management and ownership to assure depositors such as the Plaintiff class herein that their deposits were safe and sound.

153. Defendant Ernst & Young did not exercise reasonable care.

154. Ernst & Young breached their professional duty as auditors to the actual and potential depositors of Superior Bank. Ernst & Young foresaw or should have forseen that depositors would rely on upon their assessment of Superior's financial condition.

155. Plaintiffs named herein suffered pecuniary loss by reasonably and justifiably relying on Defendant's misstatements and/or omissions.

156. Consequently, Defendant Ernst & Young is liable to Plaintiffs for negligent

misrepresentation.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A. Declare this action to be a proper class action and certify Plaintiffs as Class representatives under 735 ILCS 5/2-802;

B. Award damages in favor of Plaintiffs and the Class against all Defendants for the damages sustained as a result of Defendants' wrongdoing together with interest thereon;

C. Award Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, and experts;

D. Alternatively, grant Plaintiffs their Attorney's fees and costs as appropriate in view of the relief granted and as required under 12 U.S.C. § 1975 and 18 U.S.C. § 1964(c).

E. Declare that Defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act.

F. Declare that Defendants have violated the Racketeering Influenced and Corrupt Organizations Act.

G. Direct Defendants, jointly and severally, to account for all losses and/or damages sustained by Plaintiffs and the Class and by reason of the acts and omissions complained of herein;

H. Award Plaintiffs jointly and severally, pursuant to 18 U.S.C. Section 1964(c), treble damages as persons injured in their business or property by reason of the Defendant's violation of RICO Section 1962;

38

I.  Award pre-judgment and post-judgment interest as allowed by law;

J.  Grant such other and further relief as this Court may deem just and proper.

Respectfully submitted,

Clinton A. Krislov
Attorney for Plaintiffs

Dated: August 28, 2002

Clinton A. Krislov
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
(312) 606-0500

Jeff Friedman
FRIEDMAN & HOLMAN
Three First National Plaza
Suite 5050
Chicago, Illinois 60602
Tel:  (312) 357-0445
Fax  (312) 332-9791

George B. Collins
COLLINS & BARGIONE
One N. LaSalle, Suite 2235
Chicago, Illinois 60602

*Attorneys for Plaintiffs*

F:\CASES\Superior Bank\Pleadings\Complaints\Complaint17.wpd

## CERTIFICATE OF SERVICE

Timothy J. Miller, an attorney, hereby certifies that he served the foregoing Notice of Removal of Civil Action by causing a true and correct copy thereof to be delivered by messenger to:

> Clinton Krislov
> KRISLOV & ASSOCIATES, LTD.
> 20 North Wacker Drive
> Suite 1350
> Chicago, Illinois 60606
>
> Stanley J. Parzen
> Edward H. Williams
> MAYER, BROWN, ROWE & MAW
> 190 South LaSalle Street
> Chicago, Illinois 60603
>
> Ms. Dorothy Brown
> Clerk of the Court
> Circuit Court of Cook County, Illinois
> Richard J. Daley Center
> Room 1001
> Chicago, Illinois 60602

on this 27th day of September, 2002.

_____
Timothy J. Miller

JS 44
(Rev. 07/89)

**CIVIL COVER SHEET**

The JS-44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON THE REVERSE OF THE FORM.)

**02C 6926**

## I (a) PLAINTIFFS

John W. Courtney, Frances T. Lax,
Lawrence M. Green and Irene L. Kortas
on behalf of themselves and all others
similarly situated

**DEFENDANTS**

Neal T. Halleran, William C. Bracken, Nate
Kurs, Nelson L. Stephenson, Glen Miller, Mar
Weisman, Steve Mann, Walter F. Rusnak, Penny
S. Pritzker, Thomas J. Pritzker, Alvin Dworm
Coast-to-Coast Financial Corporation, Ernst

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF ___Cook___
(EXCEPT IN U.S. PLAINTIFF CASES)

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT ___Young___
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE
TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)
Clinton A. Krislov
Krislov & Associates, Ltd.
20 N. Wacker Dr., Suite 1350
Chicago, Illinois 60606
(312) 606-0500

**DOCKETED**
SEP 3 0 2002

ATTORNEYS (IF KNOWN)
Novack and Macey          Covington & Burling
303 W. Madison Street    1330 Ave. of the Ame
Suite 1500                New York, NY 10019
Chicago, IL 60606        (212) 841-1000
(312) 419-6900

**JUDGE GOTTSCHALL**

**MAGISTRATE JUDGE DEVIN**

## II. BASIS OF JURISDICTION (PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☐ 2 U.S. Government
Defendant

☒ 3 Federal Question
(U.S. Government Not a Party)

☐ 4 Diversity
(Indicate Citizenship of
Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (PLACE AN x IN ONE BOX FOR PLAINTIFF AND ONE BOX FOR DEFENDAN)
(For Diversity Cases Only)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business In Another State | ☐ 5 | ☐ |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ |

## IV. CAUSE OF ACTION (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

DO NOT CITE JURISDICTIONAL STATUTES UNLESS DIVERSITY.)

RICO - 18 U.S.C. 1962(c)

## V. NATURE OF SUIT (PLACE AN x IN ONE BOX ONLY)

| CONTRACT | TORTS | | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|---|
| ☐ 110 Insurance | PERSONAL INJURY | PERSONAL INJURY | ☐ 610 Agriculture | ☐ 422 Appeal 28 USC 158 | ☐ 400 State Reapportionment |
| ☐ 120 Marine | ☐ 310 Airplane | ☐ 362 Personal Injury— Med Malpractice | ☐ 620 Other Food & Drug | ☐ 423 Withdrawal 28 USC 157 | ☐ 410 Antitrust |
| ☐ 130 Miller Act | ☐ 315 Airplane Product Liability | ☐ 365 Personal Injury— Product Liability | ☐ 625 Drug Related Seizure of Property 21 USC 881 | | ☐ 430 Banks and Banking |
| ☐ 140 Negotiable Instrument | ☐ 320 Assault, Libel & Slander | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 630 Liquor Laws | **PROPERTY RIGHTS** | ☐ 450 Commerce/ICC Rates |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 330 Federal Employers' Liability | | ☐ 640 R.R. & Truck | ☐ 820 Copyrights | ☐ 460 Deportation |
| ☐ 151 Medicare Act | ☐ 340 Marine | PERSONAL PROPERTY | ☐ 650 Airline Regs | ☐ 830 Patent | ☒ 470 Racketeer Influenced and Corrupt Organization |
| ☐ 152 Recovery of Defaulted Student Loans (Excl. Veterans) | ☐ 345 Marine Product Liability | ☐ 370 Other Fraud | ☐ 660 Occupational Safety/Health | ☐ 840 Trademark | ☐ 810 Selective Service |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 350 Motor Vehicle | ☐ 371 Truth in Lending | ☐ 690 Other | **SOCIAL SECURITY** | ☐ 850 Securities/Commoditi Exchange |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle Product Liability | ☐ 380 Other Personal Property Damage | **LABOR** | ☐ 861 HIA (1395ff) | ☐ 875 Customer Challenge 12 USC 3410 |
| ☐ 190 Other Contract | ☐ 360 Other Personal Injury | ☐ 385 Property Damage Product Liability | ☐ 710 Fair Labor Standards Act | ☐ 862 Black Lung (923) | ☐ 891 Agricultural Acts |
| ☐ 195 Contract Product Liability | | | ☐ 720 Labor/Mgmt. Relations | ☐ 863 DIWC/DIWW (405(g)) | ☐ 892 Economic Stabilizati Act |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act | ☐ 864 SSID Title XVI | ☐ 893 Environmental Matter |
| ☐ 210 Land Condemnation | ☐ 441 Voting | ☐ 510 Motions to Vacate Sentence | ☐ 740 Railway Labor Act | ☐ 865 RSI (405(g)) | ☐ 894 Energy Allocation Act |
| ☐ 220 Foreclosure | ☐ 442 Employment | Habeas Corpus: | ☐ 790 Other Labor Litigation | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 443 Housing/ Accommodations | ☐ 530 General | ☐ 791 Empl. Ret. Inc. Security Act | ☐ 870 Taxes (U.S. Plaintiff or Defendant) | ☐ 900 Appeal of Fee Determ Under Equal Access Justice |
| ☐ 240 Torts to Land | ☐ 444 Welfare | ☐ 535 Death Penalty | | ☐ 871 IRS—Third Party 26 USC 7609 | ☐ 950 Constitutionality of State Statutes |
| ☐ 245 Tort Product Liability | ☐ 440 Other Civil Rights | ☐ 540 Mandamus & Other | | | ☐ 890 Other Statutory Actions |
| ☐ 290 All Other Real Property | | ☐ 550 Civil Rights | | | |

## VI. ORIGIN (PLACE AN x IN ONE BOX ONLY)

☐ 1 Original Proceeding   ☒ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ 6 Multidistrict Litigation   ☐ 7 Appeal to District Judge from Magistrate Judgment

## VII. REQUESTED IN COMPLAINT:
CHECK IF THIS IS A **CLASS ACTION**
☒ UNDER F.R.C.P. 23

**DEMAND $**
Unknown

Check YES only if demanded in complaint:
**JURY DEMAND:** ☒ YES ☐ N

## VIII. REMARKS
General Rule 2.21D(2)

In response to ☒ is not a refiling of a previously dismissed action
this case ☐ is a refiling of case number _____ of Judge _____

DATE
9/27/02

SIGNATURE OF ATTORNEY OF RECORD
_Smoty Mull_

UNITED STATES DISTRICT COURT

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

**DOCKETED**

SEP 3 0 2002

In the Matter of

COURTNEY, et al. v. HALLERAN, et al.

02C 6926

Case Number:

Hon.

**JUDGE GOTTSCHALL**

## APPEARANCES ARE HEREBY FILED BY THE UNDERSIGNED AS ATTORNEY(S) FOR:

Defendants Neal T. Halleran, William C. Bracken, Monte Kurs, Nelson L. Stephenson, Glen Miller, Marc A. Weisman,

Steve Mann, Walter F. Rusnak, Penny S. Pritzker, Thomas J. Pritzker, Alvin Dworman, Coast-to-Coast Financial Corporation

MAGISTRATE JUDGE LEVIN

| (A) | (B) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME Stephen Novack | NAME Timothy J. Miller |
| FIRM NOVACK AND MACEY | FIRM NOVACK AND MACEY |
| STREET ADDRESS 303 West Madison Street, Suite 1500 | STREET ADDRESS 303 West Madison Street, Suite 1500 |
| CITY/STATE/ZIP Chicago, Illinois 60606 | CITY/STATE/ZIP Chicago, Illinois 60606 |
| TELEPHONE NUMBER (312) 419-6900 | TELEPHONE NUMBER (312) 419-6900 |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 2067587 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6191007 |
| MEMBER OF TRIAL BAR? YES ☒ NO ☐ | MEMBER OF TRIAL BAR? YES ☒ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☒ NO ☐ |
| | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ |

| (C) | (D) |
|---|---|
| SIGNATURE | SIGNATURE |
| NAME David W. Haller | NAME |
| FIRM COVINGTON & BURLING | FIRM |
| STREET ADDRESS 1330 Avenue of the Americas | STREET ADDRESS |
| CITY/STATE/ZIP New York, NY 10019 | CITY/STATE/ZIP |
| TELEPHONE NUMBER (212) 841-1000 | TELEPHONE NUMBER |
| IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) 6197663 | IDENTIFICATION NUMBER (SEE ITEM 4 ON REVERSE) |
| MEMBER OF TRIAL BAR? YES ☐ NO ☒ | MEMBER OF TRIAL BAR? YES ☐ NO ☐ |
| TRIAL ATTORNEY? YES ☒ NO ☐ | TRIAL ATTORNEY? YES ☐ NO ☐ |
| DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☒ | DESIGNATED AS LOCAL COUNSEL? YES ☐ NO ☐ |