# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

JOHN W. COURTNEY,
FRANCES T. LAX, LAWRENCE M.
GREEN, and IRENE KORTAS
on behalf of themselves and all others
similarly situated,

        Plaintiffs,

    v.

NEAL T. HALLERAN, *et al.*,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)

No. 02 C 6926

Hon. Joan B. Gottschall

**FILED**

JUL - 2 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

---

## NOTICE OF FILING

To:    See attached Service List

Please take notice that on July 2, 2003 we filed with the Court the attached:

### FOURTH AMENDED CLASS ACTION COMPLAINT

Respectfully submitted,

*[signature]*

Attorney for Plaintiffs

**DOCKETED**

JUL 3 2003

KRISLOV & ASSOCIATES, LTD.
Clinton A. Krislov
Jason P. Stiehl
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
(312) 606-0500

## **PROOF OF SERVICE**

I, Clinton A. Krislov, an attorney, on oath certify that I caused a copy of this Notice and attached Fourth Amended Complaint to be served upon the individuals listed on the attached Service List at their respective address by United States Postal Service or by overnight courier on July 2, 2003.

_____
**Clinton A. Krislov**

*Courtney, et al. v. Halleran, 02 cv 6926*

## SERVICE LIST

Timothy J. Miller
NOVAK & MACEY
303 W. Madison, Ste. 1500
Chicago, IL 60606
*Attorney for Defendants*

David Haller
COVINGTON & BURLING
1330 Avenue of the Americas
New York, NY 10019
*Attorney for the Defendants*

Jeff Friedman
FRIEDMAN & HOLMAN
Three First National Plaza, Ste. 5050
Chicago, IL 60602
*Attorney for Plaintiffs*

George B. Collins
COLLINS & BARGIONE
One N. LaSalle, Ste. 2235
Chicago, IL 60602
*Attorney for Plaintiffs*

Stanley J. Parzen
MAYER BROWN ROWE & MAW
190 S. LaSalle St.
Chicago, IL 60603

F. Thomas Hecht
Celiza M. Braganca
Ungaretti & Harris
3500 Three First National Plaza
Chicago, IL 60602

Emily E. Sommers (by Federal Express)
Federal Deposit Insurance Corporation
1717 H Street, N.W.
Washington, DC 20006

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

**FILED**

JUL - 2 2003

**MICHAEL W. DOBBINS**
**CLERK, U.S. DISTRICT COURT**

| | |
|---|---|
| JOHN W. COURTNEY, FRANCES T. LAX, LAWRENCE M. GREEN, and IRENE KORTAS on behalf of themselves and all others similarly situated, | ) ) ) ) ) |
| Plaintiffs, | ) ) ) |
| v. | ) ) |
| NEAL T. HALLERAN, WILLIAM C. BRACKEN, MONTE KURS, NELSON L. STEPHENSON, GLEN MILLER, MARC A. WEISMAN, STEVEN MANN, WALTER F. RUSNAK, PENNY S. PRITZKER, THOMAS J. PRITZKER, ALVIN DWORMAN, COAST-TO-COAST FINANCIAL CORPORATION, ERNST & YOUNG LLP, FEDERAL DEPOSIT INSURANCE CORPORATION, in its corporate capacity, and all other unknown Defendants, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

No. 02 C 6926

Hon. Joan B. Gottschall

**JURY TRIAL DEMANDED**

**DOCKETED**
JUL 3 2003

## FOURTH AMENDED COMPLAINT

Plaintiffs John W. Courtney, Frances T. Lax, Lawrence M. Green, and Irene Kortas

("Plaintiffs"), individually and on behalf of themselves and as representatives of all other persons

similarly situated, by and through their undersigned attorneys, for this class action, allege upon

personal knowledge as to their own acts, and as to all other matters upon information and belief,

and upon the investigation made by and through their attorneys, which investigation included,

*inter alia*, a review of public filings, documents and press releases of Superior Bank, FSB,

Hinsdale, the Federal Deposit Insurance Corporation ("FDIC"), and the Office of Thrift Supervision ("OTS"), state as follows:

## Nature of the Action

1. Plaintiffs bring this action for themselves, and as a class action for all other persons who were induced to deposit, or leave on deposit, money in Superior Bank, FSB, Hinsdale, Illinois ("Superior Bank") during the period at least from June 30, 1998 through the bank's July 27, 2001 closing, and who were thereafter unable to recoup some of their deposit. Plaintiffs seek recovery of their damages under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. Section 1962(c), the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/2, asserting that the defendants variously mis-stated, or are responsible as principals, responsible parties, or aiders or abettors, for the misstatements of (a) the financial condition of the bank in financial statements, and other promotional materials and misstatements derived in part from those mis-stated financials, and/or (b) legal advice in constructing deposits to achieve full FDIC insurance, that were provided to depositors and prospective depositors, in order to draw in capital to fund the bank's predacious lending operations and enable some of the defendants to obtain hundreds of millions of dollars in illegal loans and dividends.

2. Although the full extent of the fraudulent schemes are still being uncovered, Plaintiffs believe that the Defendants perpetrated a fraudulent pattern or scheme, whereby Defendants deliberately misstated the assets, earnings and financial condition of Superior Bank as a means to lure depositors into the Bank, corruptly funnel money out to the Pritzker and Dworman interests, and their holding company, Coast-to-Coast Financial Corporation,

2

fraudulently profiting them from their pattern of malfeasance and impairing Superior Bank's ability to repay depositors of the class.

3. Following their December, 1988, acquisition of Superior Bank for only $42.5 million of their own money, and the receipt of $645 million in benefits from the government (composed of cash, tax credits and loan guarantees), Defendants lured depositors into the Bank, using misstatements of the institution's financial condition, pulled out over $200 million for themselves, and promised to add in another $270 million in cash; but then yanked their support for this Capital Plan, settled with the Federal government by repaying only $100 million cash and the promise to pay $360 million more over 15 years of payments, and left uninsured depositors with $30-45 million in real losses.

4. Further, Plaintiffs, when depositing funds into Superior Banks, were deceived as to both the financial status of the bank as well as the insured status of their deposits. Plaintiffs, conservative and unsavvy depositors looking for safe ways to deposit their money, were solicited to make deposits in excess of $100,000, and they were informed and advised by Superior Bank employees that the Bank was in sound financial condition, sometimes providing actual financial statements or graphs supporting these misrepresentations, and that their deposits would be set up to be fully insured by the FDIC, as a result of their being placed, *inter alia,* into separate certificates of deposit, or into accounts that would be insured in excess of $100,000. In fact, both statements were knowingly false. The Bank was actually in terrible financial condition; actually needed more capital, while defendants, supported by cooked financials, were actually withdrawing hundreds of millions of dollars for themselves. Plaintiffs' deposits were also not fully insured, because Superior Bank employees made various misleading statements as to the

insured status of Plaintiffs' funds and deceived the Plaintiffs and the Class into depositing funds in excess of $100,000.00. Plaintiffs and other class members reasonably relied on the misstatements to them, deposited money in excess of $100,000, and were damaged when, following the bank's closure, they were unable to recover the amounts of their deposits. Plaintiffs with multiple accounts were additionally surprised to learn that since these deposits were not recognized by the FDIC as deposits maintained in different rights and capacities these deposits were not insured separately from each other. Other depositors were surprised to learn that special accounts such as individual retirement accounts ("IRAs") were not insured in excess of $100,000. Because of Defendants' deceptive acts and practices the Plaintiffs have been damaged thereby.

5. On July 27, 2001, the OTS appointed the FDIC as receiver of Superior Bank because of the mismanagement of Superior Bank and the faulty accounting opinions issued by Ernst & Young. The FDIC in turn transferred the insured deposits and substantially all of the assets of Superior Bank to a newly chartered full-service mutual savings bank, Superior Federal. As a result, uninsured deposits, i.e., deposits in excess of one hundred thousand dollars, were not transferred to Superior Federal, resulting in these deposits remaining with the now defunct Superior Bank.

6. Damaged with no other source of relief. Depositors of Superior Bank, including Plaintiffs, whose deposits were not transferred to Superior Federal were damaged in an amount equal to the shortfall in the return of their non-insured deposits.

6a. Class members have no other meaningful source of relief. By federal statute, uninsured depositors are guaranteed reimbursement by the FDIC for their losses **when the FDIC**

**sues as receiver of the bank**. However, in the currently pending case involving the same facts, *FDIC v. Ernst & Young LLP*, (N.D. Ill., No. 02C 7914, assigned to Judge Gettleman), the FDIC is suing in its **corporate capacity**, for amounts it has incurred or paid out already, and for recovery for the Pritzker/Dworman group, but seeks nothing for the shortfall suffered by the uninsured depositors. Judge Gettleman, as will be discussed in further detail below, recently dismissed this suit for lack of standing. It is in this capacity, and under these circumstances, that the under-insured depositors bring this suit, as their only meaningful avenue for relief.

7. Plaintiffs seek to recover the amounts lost by members of the class through their investment with Superior Bank, together with all other just and deserved damages, costs and reasonable attorneys fees provided under federal RICO provisions and applicable state statutes, as well as a declaration of the nullity of the contract entered into between the FDIC and the Pritzkers and Dworman, which would give the Pritzkers/Dworman group a priority ahead of the depositors rights under federal law and regulations.

### Jurisdiction and Venue

8. This case was originally filed in Illinois state court, which had jurisdiction over this litigation under the Illinois Code of Civil Procedure, 735 ILCS 5/2-209(a)(1) (for the transaction of any business within this State), and (a)(7) (for the making or performance of any contract or promise substantially connected with this State). Subsequently, with the addition of the federal civil RICO count, the case was removed to this court, which has jurisdiction under 18 U.S.C. §1964(a) (civil RICO jurisdiction) plus 28 U.S.C. § 1367 (Supplemental Jurisdiction) with respect to the other causes of action, which are so related to the federal claim that they form part of the same case or controversy.

9. Venue was originally proper in Cook County under the Illinois Code of Civil Procedure, 735 ILCS 5/2-101, as it is the county in which the transaction or some part thereof occurred out of which this cause of action arose, and remains proper in this district under 28 U.S.C. §1391(a) because most of the defendants reside in this district and most of the actions complained of occurred in this district.

## The Parties

### A.    Plaintiffs

10. <u>John W. Courtney</u>, after being shown documents and graphs believed to be based on Ernst & Young's Superior Bank financial statements, purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Mr. Courtney's deposits were uninsured and as a result Mr. Courtney was damaged thereby, in an amount in excess of $200,000.

11. <u>Irene L. Kortas</u> purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Ms. Kortas' deposits were uninsured and as a result Ms. Kortas was damaged thereby, in an amount in excess of $100,000.

12. <u>Frances T. Lax</u> purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined that a portion of Ms. Lax's deposits were uninsured and as a result Ms. Lax was damaged thereby, in an amount in excess of $150,000.

13. <u>Lawrence Green</u> purchased certificates of deposits from Superior Bank, which remained with Superior Bank, when Superior Bank was placed into receivership. The FDIC has determined

6

that a portion of Mr. Green's IRA deposit was uninsured and as a result Mr. Green was damaged thereby, in an amount in excess of $30,000.

**B.**   **Defendants**

This action is brought against:

14. <u>Neal Halleran</u> was the Chairman, President and Executive Officer of Superior Bank. As Chairman, President and Executive Officer, he failed to reasonably supervise the affairs of Superior Bank, and failed to exercise ordinary care in the discharge of his duties;

15. <u>William C. Braken</u> was the Senior Vice President, Chief Financial Officer, Secretary and Treasurer of Superior Bank. Mr. Bracken was responsible for classified asset reporting and verification of the major assets of Superior Bank. Mr. Bracken was replaced on January 22, 2001. As Senior Vice President, Chief Financial Officer, Secretary and Treasurer, he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

16. <u>Monte Kurs</u> was a Director and Executive Vice President of Superior Bank. As a Director and Executive Vice President of Superior Bank he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

17. <u>Nelson L. Stephenson</u> was a Director since 1990 and Chairman since 1997 of Superior Bank. Mr. Stephenson was instrumental in developing and coordinating loan securitization and sales activities. Mr. Stephenson resigned from the Board on January 22, 2001. Mr. Stephenson was instrumental in developing and coordinating loan securitization and sales activities at Superior Bank. As a Director and Chairman he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

18. Glen Miller was a Director of Superior Bank. As a Director he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

19. Marc A. Weisman was a Director of Superior Bank. As a Director he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

20. Stephen Mann was Chairman of Superior Bank, since January 22, 2001. As Chairman, he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

21. Walter F. Rusnak was the Chief Financial Officer and Secretary of Superior Bank, since no later than January 11, 2001. As a the Chief Financial Officer and Secretary he failed to reasonably supervise the affairs of Superior Bank and failed to exercise ordinary care in the discharge of his duties;

22. Defendant Penny S. Pritzker, is sued personally and in her capacity as chairperson of Superior Bank from 1989 to 1994, and as a director of Coast-to-Coast Financial Corporation through at least July 2001;

23. Defendant Thomas J. Pritzker, is sued personally and in his capacity as a control person of Coast-to-Coast Financial Corporation;

24. Defendant Alvin Dworman, is sued personally and in his capacity as a control person of Coast-to-Coast Financial Corporation;

25. At all times relevant to this Complaint: (a) Defendant Coast-to-Coast Financial Corporation ("CCFC" or the "Holding Company") was a holding company incorporated in

Nevada and operating under the control of Defendant persons Thomas J. Pritzker and Alvin

Dworman. Further, Superior Bank was a national bank or FSB, maintaining offices in Chicago,

Cook County, Illinois, and subject to the proscriptions imposed by the Racketeer Influenced and

Corrupt Organizations Act. 18 U.S.C. §§ 1961-1968. Subsequent to the initial filing of this

matter, Superior Bank was closed and taken over by the Federal Deposit Insurance Corporation

as receiver;

26. Ernst & Young LLP, during all relevant times of the operation of the Bank, was the

auditor responsible for certifying its financial condition to the Federal government, the public and

depositors, and persons considering whether to make deposits in Superior. The financial

statements prepared by Ernst & Young were an integral part of Superior's program to lure in

high-end depositors like the Plaintiffs, and assure them the bank was profitable, solvent and

secure.

27. Federal Deposit Insurance Corporation ("FDIC"), during all relevant times of the

operation of the Bank, acted in its corporate capacity as an insurer of up to $100,000 on each

deposit made into Superior. It further acted in its receivership capacity by marshalling Superior's

assets and distributing them to the bank's creditors, insured depositors, and shareholders. The

FDIC, in its corporate capacity, entered into an agreement with the Pritzkers and Dworman

absolving the Pritzkers and Dworman of nearly $900 million liabilities ($645 million in interest

credits received, plus $180 million in dividends taken from fictitious earnings, plus $100 million

improperly loaned to Dworman) in exchange for payment of $100 million initially, plus an

additional 360 million spread over the next fifteen years. Added to that an unprecedented benefit

not previously granted to the owners of a failed bank, the FDIC agreed to sue the Bank's

9

accounting firm Ernst & Young jointly with Pritzkers/Dworman, and apportion the recovery to the Pritzkers and Dworman, giving them 25% of any moneys recovered and 50% of any penalties or punitive recoveries. The agreement provides that the recovery will be first allocated to the FDIC fund and to the Pritzkers and Dworman, with no provision assuring the repayment of the uninsured depositors. A copy of the Settlement Agreement is attached hereto as Exhibit 1. By entering into such an agreement, the FDIC unilaterally violated the depositors' priorities set by federal law and regulations and abandoned and endangered the rights of the uninsured depositors protected under the FDIC's statutory distribution provisions in favor of the wrongdoers whose actions had helped bring the Bank down.

## Factual Allegations

### A. General Background of Superior Bank Failure

28. The Pritzker/Dworman acquisition of Superior Bank. In December 1988, Lyons Saving Bank, Countryside, Illinois, which had been previously taken over by federal regulators, was sold to Coast-to-Coast Financial Corporation (wholly owned by the Pritzker/Dworman group). Per Crain's Chicago Business, October 1 1990, the Pritzker/Dworman/CCFC group paid $42.5 million, and received some $645 million in federal/FSLIC assistance, by way of cash, tax credits and other benefits.

29. The Pritzker and Dworman interests each appointed half of the directors of CCFC. CCFC owned Superior through a shell company, Superior Holdings, Inc. ("SHI"), which was formed in 1998 and became a thrift holding company in 1999. CCFC itself was owned by a multi-tiered and complex set of companies and/or trusts that are controlled by the Pritzkers and Dwormans.

10

30. According to the OTS Director's testimony before the Senate Committee on Housing, Banking, and Urban Affairs, the Pritzker and Dworman interests formed three holding companies in connection with the Superior Bank venture, Coast-to-Coast Financial Corporation, Coast Partners ("CP"), and UBH, INC. ("UBH"). UBH, is controlled by the Dwormans, while CP is controlled by the Pritzkers. CP and UBH were predominantly shell companies, each representing one family's interest and each with their primary activity being the ownership of 50 percent of CCFC. CCFC, in turn, owned 100 percent of Superior as well as several other small financial services affiliates with operations that complemented Superior. CCFC, UBH, and SP were all formed for the purpose of acquiring and operating Superior.

31. Superior Bank started with substantial tax benefits and FSLIC guaranteed assets. It is reported that the Pritzker / Dworman / CCFC group received a package totaling $645 million in "assistance," by tax benefits, cash, and promissory notes when the Lyons thrift was sold to them by federal regulators in December 1988. The weight of this contribution to the Defendants named in this complaint is vast compared to the mere $42.5 million that CCFC paid to acquire Superior Bank, an institution with assets of $1.53 billion at the time (and indeed dwarfs as well, the payments they were required to repay following Superior's collapse). As stated by a contemporaneous report in Crain's Chicago Business, January 9, 1989, the government agreed to wipe the slate clean on Lyons' old problems, allowing the new management to concentrate on building a healthy thrift.

32. Superior Bank's business strategy hinged on the acquisition of Alliance Funding at the end of 1992. Alliance Funding is Superior Bank's wholesale mortgage origination division.

33. Superior Bank became a dumping ground for poor-quality, and possibly predacious,

11

mortgages that brokers could not sell elsewhere.

34. Superior Bank's business plan included periodically securitizing some of the mortgages while retaining the servicing rights to them; selling the mortgages, for securitization purposes, for more than they were actually worth but hiding that fact by taking back interest-only strip receivables and other securitization residuals that were treated on Superior Bank's balance sheet as an asset; reporting artificially high net income because of excessive gain-on-sale income which, in context, misrepresented the solvency of the bank, to attract capital from depositors, and created a fictitious earnings amount to support substantial dividend payouts to CCFC.

35. In 1993, Superior Bank began accumulating assets associated with the retained interests in mortgage securitizations. The balance sheet categories in which these assets are placed accounted for an increasing proportion of Superior Bank's assets. Assets in these categories rose from 20% of Superior Bank's total assets at the end of 1992 to 34% the following year end, to 56% in 1996, to 60% in 1997 and to 65% at the end of 2000. While this percentage has been rising for the industry as a whole, the industry percentage has been much lower. For example, it rose 9% at the end on 1997 to 13% at the end of 2000.

36. In the 1989-99 period, Superior Bank paid $188 million in dividends to CCFC which gave Superior Bank's stockholders, the Defendants herein, a substantial return on their initial investment of $42.5 million, considered all by itself.

37. Thus, while Superior Bank's actual asset base was being eroded by its questionable loan policies, the Defendants further diminished it by helping themselves to massive amounts of cash, equaling nearly four to five times their original investments.

38. The Defendant stockholders also gained federal assistance and tax benefits

stemming from the transaction of acquiring Lyons Savings / Superior Bank, totaling approximately $645 million (corrected from "$645 billion" in First Amended Complaint).

39. According to Bert Ely, an independent banking consultant who testified before the Senate Banking Committee, at the end of 1997 Superior Bank had almost seven times as much invested in securitization-related assets as did the rest of the thrift industry. At the same time, at the end of 1997, Superior Bank's recourse exposure related to assets sold, per dollar of capital, was thirty-one times the industry average.

40. Especially troubling was Superior Bank's gathering of uninsured deposits. Superior Bank significantly increased its uninsured deposits in 1998, the year it began brokered deposits, as it grew its assets from $1.3 billion to $1.8 billion. Uninsured deposits jumped in 1998 from $93 million to $316 million and then rose to $569 million at the end of 1999 to $572 million on March 31, 2000. After decreasing by $80 million over the next six months, uninsured deposits plunged $440 million, or 89% from September 30, 2000 to March 31, 2001. This drop may reflect a correction of past accounting errors, apparently a frequent problem at Superior Bank, or a run by large depositors. Even more troubling is the increase in Superior Bank's uninsured deposits during the second quarter of 2000 when they rose $9.6 million. This increase could be the result of Superior Bank's aggressive solicitation of deposits, similar to those that Plaintiffs were induced into making just prior to Superior Bank being placed into receivership.

41. According to testimony by the director of the FDIC before the Senate Committee on Banking, Housing and Urban Affairs, September 11, 2001, a principal cause of Superior Bank's failure was the decision of its board and management to book high levels of retained interests related to the securitization of subprime assets. The retained interests were deeply subordinate,

13

at a first loss position, to more senior claims on the more than $4 billion in subprime loans that Superior Bank sold to investors. Over the course of several years Superior Bank's retained interests represented an increasing multiple of its Tier 1 capital.

42. Tier 1 capital includes equity, noncumulative perpetual preferred stock, and minority interest in consolidated subsidiaries, while Tier 2 includes the allowance for loan and lease losses, other preferred stock and subordinated debt that has an original weighted average maturity of at least five years.

43. Retained interests, sometimes referred to as "residuals," represent an accounting recognition of immediate gains on the sale of assets in the course of securitization activities.

44. Securitizing loans is a process by which a pool of loans is divided into securities by their differing levels of credit quality and then sold to investors. Superior Bank like many issuers, held onto the securities with the greatest amount of risk or otherwise provided significant credit enhancement for the less risky securities. These securities with the greatest risk included interest-only or I/O strips, spread accounts, and cash collateral or Overcollateralization Accounts ("O/C Accounts"), and are collectively known as "residuals" because they receive the last cash flows from the loans.

45. In a securitization, the subprime lender sells packages of loans to another party or institution but often retains as an asset the right to receive a portion of the cash flows expected from the loans. The expected value of these cash flows is generally referred to as retained interest.

46. Under Generally Accepted Accounting Principals ("GAAP") the fair value of these expected future cash flows are recorded on balance sheets as assets in the form on interest-only

14

strips receivable, spread accounts, or other rights, sometimes referred to as retained interests.

47. Retained interests serve as credit enhancements for the securitized assets. As such, these assets are considered to be recourse exposures that subject the institution to risk of loss on the transferred assets. As a result under the current rules, risk-based capital is required for the securitized assets that are deemed to be transferred with recourse due to the retention of these retained interests.

48. OTS & FDIC Concerns Arise. As an insurer, the FDIC's interest in the situation at Superior was heightened in December 1998, following their completion of an offsite review of the Bank, based on September 30, 1998 financial information. According to the FDIC Director's statement to the Senate Banking Committee, the FDIC's offsite review noted significant reporting differences between the Bank's audit report and its quarterly financial statement to regulators.

49. During 1999, both the OTS and the FDIC began having serious concerns about Superior Bank and initially focused their attention on an inadequate asset classification system which led to inaccurate loss reserves and regulatory accounting, as well as on the deteriorating auto portfolio. These were material flaws in Superior's financial condition. None of this was made known to prospective depositors.

50. The January 2000 examination of Superior Bank revealed many weaknesses including extremely high concentrations of high-risk assets, inadequate management and controls, inaccurate reporting, and lack of documentation and support for retained interest valuations. Defendants concealed these facts from prospective depositors, as well.

51. As a result of OTS's examination report, the OTS sent to Superior Bank's board of

15

directors on July 5, 2000, a notice of deficiency requiring Superior Bank to submit a safety and soundness compliance plan pursuant to section 39 of the Federal Deposit Insurance Act. The notice required Superior Bank to take the following action:

- develop procedures for analyzing the ongoing fair market value of the institution's residual assets;

- obtain periodic independent valuation of a sample of receivables;

- develop a plan to reduce the level of residual assets;

- revise the institution's automobile lending policy and establish performance targets for its automobile lending operation; and

- develop a revised Allowance for Loan and Lease Losses ("ALLL") policy and maintain adequate loan loss reserves.

52. Due to OTS's concerns regarding the concentration of assets in residuals, Superior Bank's Board ceased securitizing loans at the thrift and instead sold newly originated loans to its holding company. This stopped the growth of residuals at Superior.

53. On July 7, 2000, OTS forwarded a supervisory letter to Superior Bank officially notifying Superior Bank and its Board of OTS's designation of Superior Bank as a problem institution. The notice from OTS prohibited asset growth, except in the amount of interest on deposits, and placed other restrictions on Superior Bank. Defendants concealed this information, as well, from prospective depositors.

54. Superior's board of directors submitted a compliance plan to OTS on August 4, 2000. The board's response indicated that procedures were being developed and implemented, with assistance of E&Y to value the institution's residual assets.

'55. According to the FDIC Director's statement to the Senate Banking Committee, the FDIC in August 2000 noted that estimated future cash flows were not discounted to present value for some retained interests, which had the potential of significantly overstating the value of the retained interests. In late August 2000 the FDIC and the OTS raised the issue with E&Y who agreed to revisit the issue as part of their upcoming audit of Superior's June 2000 fiscal year-ending financial statements.

56.     On October 16, 2000 an OTS examination of Superior Bank was begun which continued into early 2001 because of significant problems which were uncovered during the examination. The OTS's examination disclosed that Superior Bank's financial statements for June 30, September 30, and December 31, 2000 contained significant errors. The fair market value analysis of the residual assets had not been completed. Management also failed to implement several of OTS's January 2000 examination instructions and continued to delay required adjustments to the financial statements during the course of the field visit.

57.     In October 2000 Ernst & Young issued their audit of Superior Bank for fiscal year ending June 30, 2000. OTS and FDIC conducted a review of not only the audit but also the supporting documentation.

58.     During this time OTS and FDIC accountants had meetings and discussions with E&Y and Superior Bank concerning whether GAAP had been appropriately applied to the Overcollateralization Accounts.

59.     Per the OTS Director's testimony before the Senate Banking Committee, OTS informed Superior, on November 15, 2000, that their residual assets were significantly overstated at June 30 due to the absence of valuation procedures and the use of incorrect accounting

treatment. The examiners concluded that Superior Bank, notwithstanding representations to the contrary, was not accounting for the residual assets in compliance with Statement of Financial Accounting Standards, No. 125 ("SFAS 125"). SFAS 125 is "Accounting for Transfers and Servicing of Financial Assets and extinguishment of liabilities" issued by the Financial Accounting Standards Board.

60. The OTS director concluded that, in connection with the bank's failure to comply with SFAS 125, Superior had overstated the value of its residual assets when it failed to properly recognize the impact of timing delays in the receipt of cash flow in the Overcollateralization assets within the residual retained on its books. The OTS Director also concluded that E&Y failed to object to this improper reporting.

61. Further, this aforementioned auditing error caused Superior Bank to report inflated assets, earnings and capital. Combined with other adjustments the examiners estimated an appropriate write-down of the residuals might exceed $200 million.

62. In addition, according to the head of OTS's Senate testimony, OTS's and FDIC's October 2000 field visit disclosed that Superior's management and board of directors failed to take certain actions to ensure that the books and records accurately reflected true financial conditions of the institution. These actions primarily involved the failure to recognize various write-downs applicable to the institution's automobile loan operations.

63. On December 19, 2000 OTS and FDIC met with Superior Bank and E&Y to discuss the accounting treatment of the residual assets. Also present at this meeting was a consultant hired directly by the holding company, CCFC. OTS advised Superior Bank that the accounting treatment was incorrect and a significant adverse valuation adjustment to these assets was

necessary. Superior Bank management and E&Y continued to disagreed with OTS and the FDIC.

64. The FDIC Director testified before the Senate Banking Committee that, between October and December, 2000, in various correspondence, the local E&Y office attempted to support its position that the future estimated cash flows should not be discounted. OTS and FDIC objected, and in late December OTS insisted that the issue be raised with E&Y's National Office.

65. On January 11, 2001 a meeting was held among representatives from Superior's management, OTS, FDIC, Superior's holding company, outside consultants, and E&Y about the discounting issue. Also on this date an E&Y's national review official acknowledged that the accounting treatment applied by E&Y to the residual assets was incorrect, although E&Y did not agree as to the amount of the adjustment. The revaluation later resulted in a write-down of the residual assets in the amount of $270 million.

66. <u>Direction to Submit Prompt Corrective Action Plan</u>. OTS Director Ellen Seidman testified before the Senate Banking Committee that, on February 12, 2001 Superior Bank's board was directed to submit a Prompt Corrective Action ("PCA") Capital Restoration Plan by mid-March of 2001. On February 14, 2001 OTS issued a PCA directive based upon OTS's determination that the institution was "significantly undercapitalized." Further, Superior Bank's holding companies, SHI and CCFC, consented to the issuance of a cease and deist order, and to fund an escrow account at Superior Bank in an amount not to be less than $5 million at all times. This account was designed to cover any losses from Superior Bank's weekly sale of mortgage loans.

67. The February, 2001 PCA required significant operating changes as well as a major

capital infusion, and did so even before the Bank reported itself to be significantly

undercapitalized, according to testimony by the OTS Director before the Senate Committee on

Banking, Housing, and Urban Affairs.

68. On March 14, 2001 Superior Bank submitted the first version of a Capital Plan. On

that same day, OTS and FDIC examiners determined that the institution's low capital level,

concentration of high risk assets, and large operating losses required an immediate capital

infusion for Superior to become a viable institution.

69. Plaintiffs believe that, due to the problems with the erroneous accounting

interpretations, wholly accurate audit and financial information on Superior Bank have not been

available for at least the past three fiscal years, since approximately June 30, 1998.

70. According to a report by the OTS Director, for example, the financial statements

accompanying the June 2000 independent audit by E&Y do not accurately reflect the fair market

value of Superior's residual assets under GAAP. E&Y was not retained by Superior to perform

the Bank's audit work for the year ended June 30, 2001.

71. Overall, according to an August 7, 2001 Washington Post article, Federal regulators

concluded that bad lending practices, improper bookkeeping and improper oversight by the bank

company's owners and directors were the predominant causes of the failure of the $2.3 billion

Superior Bank, which specialized in making high-interest mortgages and automobile loans to

low-income borrowers nationwide.

72. Deposits made by Plaintiffs.    Through the use of financial statements, promises of

stability, promises of insured status, or general failure to prevent such illegitimate statements

from being used, Defendants ensnared Plaintiffs into the following transactions:

73. <u>Courtney Deposits</u>. On or about May 12, 2001, and at various subsequent times thereafter, Mr. Courtney met with Superior Bank sales assistant, Margaret Figus, at the Superior Bank branch located at 9161 W. 151st Street, Orland Park, Illinois. Ms. Figus, while reading from or referring to a Superior Bank document which referred to Superior Bank as a "family" firm backed by the Pritzkers, informed Mr. Courtney that Superior Bank was in a very sound and stable financial condition. This was an untrue statement at the time it was made. Ms. Figus also advised Mr. Courtney as to how to title his certificates of deposit into three separate accounts so that they would each be insured for $100,000. Plaintiff Courtney reasonably relied upon the misinformation provided him as to both the Bank's financial condition and the structuring of his accounts.

74. <u>Kortas Deposits</u>. On or about September 11, 1999 Ms. Kortas met with Superior Bank sales associate Cathy Halvey, at the Superior Bank branch located at 144 S. Euclid Ave., Park Ridge, Illinois. Ms. Kortas, purchased on that date a certificate of deposit. Ms. Kortas was informed that by placing different account names on her certificates of deposit that each one of her certificates of deposit would be fully insured up to $100,000.00. Ms. Kortas reasonably relied on this misinformation and so did purchase seventeen certificates of deposit from Superior Bank, believing them all to be fully insured.

75. <u>Green Deposits</u>. On or about May 7, 2001, Mr. Green met with Superior Bank Personal Banker Mark Noyszewski at the Superior Bank at 8963 Golf Road, Niles, Illinois. Mr. Green purchased on that date an Individual Retirement Account in the amount of $130,040.79. Mr. Green was shown a "Personalized Financial Information Sheet" which set forth anticipated interest figures. Mr. Green was informed by Noyszewski that this account was FDIC insured in

its entire amount, and he reasonably relied on this misstatement. Were it not for this guarantee, Mr. Green would not have purchased the account.

76. <u>Lax Deposits</u>. On or about May, 1997, Mrs. Lax, and at various times subsequent to said date, met with Superior Bank sales assistant, Jill Amudsen and her supervisor Ernie Hernandez, at the Superior Financial Center located at 1418 Waukegan Road, Glenview, Illinois. Ms. Amudsen and Mr. Hernandez each assured Mrs. Lax that her certificates of deposit would be completely insured provided that she titled her certificates of deposit to include a third party and that no one certificate of deposit exceeded $100,000. Mrs. Lax reasonably relied on these statements, and so subsequently purchased three certificates of deposit totaling $250,000. Ms. Amudsen or Mr. Hernandez periodically contacted Mrs. Lax to obtain her approval for opening new certificates of deposit upon the maturation of older investments. Mrs. Lax reasonably relied or Superior's employees repeated assurances of complete safety of her investments, and would otherwise not have invested in Superior's certificates of deposit.

77. The Defendants who were officers and directors of Superior Bank, knowingly gave or caused to be given, false information to sales associates with the knowledge that this information would be used by Superior Bank employees when discussing accounts with consumers.

78. The Defendants who were officers and directors of Superior Bank, also had a duty to supervise their employees and to train them in their duties. Defendants failed to properly train and supervise their sales associates as to FDIC regulations governing insured deposits.

79. The Defendants knowingly caused or negligently failed to prevent Ms. Figus from making false statements to Mr. Courtney which he reasonably believed and which he relied upon

22

to his detriment.

80. The Defendants knowingly caused or negligently failed to prevent Ms. Halvey from making false statements to Ms. Kortas which she reasonably believed and which she relied upon to her detriment.

81. The Defendants knowingly caused or negligently failed to prevent Mr. Noyszewski from making false statements to Mr. Green which he reasonably believed and which he relied upon to his detriment.

82. The Defendants knowingly caused or negligently failed to prevent Ms. Amudsen and Mr. Hernandez making false statements to Ms. Lax which she reasonably believed and which she relied upon to her detriment.

83. The Defendants who were officers and directors of Superior Bank, were also controlling persons. By reason of their positions with Superior Bank they were able to and did, directly or indirectly, in whole or in material part, control Superior Bank's pattern and practice of deceptively concealing and misrepresenting the amount of FDIC insurance coverage available on deposits.

84. By reason of their positions with Superior Bank, the Defendants had access to internal bank documents, reports and other information. The Defendants also attended Superior Bank management and/or board of director's meetings. As a result of the foregoing, the Defendants were responsible for Superior Bank's business decisions and practices, described herein.

85. Closure of Bank. On information and belief, and based on testimony by the FDIC director, at the time Superior Bank was closed by the Office of Thrift Supervision, Superior Bank

23

had about $49 million in uninsured deposits held by around one thousand depositors. Superior Bank suffered as a result of an unreasonable high risk business strategy which focused on the generation of significant volumes of subprime mortgages and automobile loans for sale on the secondary market. The OTS found that Superior Bank suffered from poor lending practices, improper record keeping and accounting, and ineffective board management supervision.

86. As detailed by the OTS Director to the Senate Banking Committee, Superior Bank became critically undercapitalized due largely to incorrect accounting treatment and aggressive assumptions for valuing residual assets. Because of the Defendants' mismanagement and improper accounting and record keeping, the OTS found that Superior Bank could not transact business in a safe and sound manner. As a result of the OTS's findings, the OTS determined that closure of Superior Bank and the appointment of the FDIC as receiver was necessary to protect the interests of the Superior Bank's insured depositors.

87. The FDIC asserted in its February 6, 2002 audit report that an over-reliance existed on the owners ability to provide additional support if needed. The Defendant owners could have, but chose not to, fulfill that obligation and correct that failure of the Bank.

88. On or about December 10, 2001 the FDIC entered into an agreement with Pritzkers and Dworman absolving them of any potential liability of $900 million ($600 million initial package plus $180 million in unearned dividends plus Dworman's $100 million loan), in exchange for: (a) $460 million, of which only $100 million was paid in cash, and the remaining $360 million promised to be paid, without interest, over a fifteen year period, plus (b) an agreement to jointly sue Ernst & Young, the Bank's accountants, in violation of the priorities set out by federal law and regulations by putting the former owners ahead of Bank Depositors by

24

guaranteeing the Pritzkers 25% of "any and all Case Proceeds recovered by any Agency Party in respect of the E&Y claims..., and 50% of the "amount, if any, by which (i) all civil money penalties recovered in respect of the E&Y Claims through an action by the OTS exceed (ii) five percent (5%) of the Case Proceeds theretofore recovered by any Agency Party in respect of the E&Y Claims..."

89. A portion of the proceeds of the aforementioned settlement has been distributed to persons who were issued receiver certificates on a quarterly basis over a fifteen year period. Receiver Certificates are claims for uninsured deposits. It is believed that this $460 million settlement will still fall substantially short of the amount necessary to satisfy the losses incurred by the Plaintiffs and the putative Class members.

90. As of September 2001, according to testimony by the OTS director, since 1996 there have been only three thrift failures other than the Superior collapse at issue in the present Complaint.

C. Duplicitous and Self-Dealing by the Defendants

91. Over relevant periods, the Defendants engaged in a series of acts by which capital was sucked out of the Bank and turned into either (a) dividends for the Pritzkers and Mr. Dworman (valued at over 200 million in the 1990's), (b) an unreasonably high loan to Mr. Dworman, a director of Superior's holding company or (c) transferred directly into the holding company. All of these transactions were quietly concealed from regulators, the public, and potential and current depositors.

92. Defendant Dworman, in 1996, allegedly executed and received a loan of $100 million from CCFC funded by dividends that Superior paid to CCFC. The dividends paid to

fund this loan effectively sucked the remaining capital out of Superior, and eliminated the

Defendant owners' capital cost regarding the high-risk subprime lending strategy. (Source:"The

FDIC and Recent Bank Failures," a report by the American Institute for Economic Research,

dated September 10, 2001)

93. As reported August 7, 2001 report by Kathleen Day, Washington Post Staff Writer,

the CCFC loan to Dworman was valued at $130 million. Dworman reportedly stated that it was

the Pritzker family who suggested that Dworman take the aforementioned loan, while the

Pritzker family said that Dworman asked for the loan in 1996 because he was in financial trouble.

Either way, both groups were clearly aware of, approved the transaction, and were on notice of

its irregularity and likely illegality.

94. Also in 1996, the holding company CCFC made a $70 million loan to UBH, Inc., one

of the holding companies that owned CCFC. According to a promissory note dated March 29,

1996, partial interest payments were to be made monthly through July 1997. The remainder of

the interest and all of the principal was to be paid in one installment on December 31, 1999.

Apparently, no repayments were ever made on this loan. (Source: FDIC Office of Inspector

General Report "Issues Related to the Failure of Superior Bank," February 6, 2002).

95. OTS officials also questioned whether UBH, Inc., ever made any payments to the

holding company for the aforementioned loan. According to the February 6, 2002 "Material Loss

Review of Superior Bank," Dept. of Treasury Inspector General, in March 19, 2001, the FDIC

determined that this money could have been made available to Superior when its capital levels

fell shortly after the loan payment was due. Since the terms and conditions of the loan are

somewhat vague, and no loan payments were apparently made, it raises the question of whether

26

this was actually another dividend payment rather than a loan.

96. The FDIC ultimately concluded that Superior bank had grossly inflated earnings from 1996 through 1999, based on which Superior's owners, Defendants named herein, declared and paid themselves over $200 million in dividends primarily over the same period.

97. Further, according to the recently filed civil action Federal Deposit Insurance Corporation v. Ernst & Young LLP, 02 C 7914 (N.D. Ill., complaint filed November 2, 2002) ("FDIC complaint"), E&Y's continued overvaluation of Superior's assets caused Superior to expand its securitization transactions when, in fact, they were not profitable, and resulted in approximately $173 million of dividends to shareholders of Superior, further deepening Superior's losses and, in turn, Plaintiff's and the FDIC's losses as well. (Source: FDIC Complaint, ¶ 72)

98. According to the prepared testimony of Bert Ely before the Senate Banking Committee, Superior Bank often filed erroneous Thrift Financial Reports ("TFR's") with the OTS. There are numerous inconsistencies and un-reconciled differences in Superior Bank's financial state that stem from the filing of amended TFRs. For example, until March 31, 2000 Superior had reported no interest-only strip receivables. Then Superior Bank reported $644 million in interest-only strips which accounted for 28% of its total assets. Previously, those interest-only strips appear to have been classified on Superior Bank's TFRs as "mortgage derivative securities."

99. A far more egregious reporting incident occurred for the fourth quarter of 2000. Superior Bank's initial TFR for December 31, 2000 reported that it had $255.7 million in capital on that date, for an 11.2% leverage capital ratio. However, in the Spring of 2001, Superior Bank

filed an amended TFR showing just $37.9 million of capital, for a capital ratio of just 1.8 % which placed Superior Bank in the critically undercapitalized category at the end of 2000.

100. Further, while Superior distributed more that $200 million in dividends to its holding company, $12.5 million of this figure was not reported on Superior's TFRs, according to the FDIC February 6, 2002 report.

101. According to the February 6, 2002 report by the Department of Treasury Inspector General, in March 19, 2001 OTS conducted a safety and soundness examination. The examiners uncovered a series of transactions involving Superior Bank and CCFC where the holding company benefitted from terms and conditions that were not at arm's length and that were detrimental to the bank. Examiners determined that these transactions totaled $36.7 million, a receivable owed to Superior by CCFC. These unsecured transactions represented a transaction with affiliates violation, and violated various statutes and regulations.

102. In compliance with an OTS corrective plan, Superior stopped securitizing loans on June 30, 2002. Even so, Superior continued to originate subprime loans. Instead of securitizing the loans and retaining the residual assets, Superior sold the loans it originated to its holding company. CCFC then securitized the loans and retained the residual assets.

103. Other ways capital was sucked out of Superior Bank and into CCFC. According to the FDIC February 6, 2002 report, OTS examiners later discovered that during the fourth calendar quarter of 2000, Superior sold these loans at a fixed price to CCFC. The loans were sold to CCFC at less than fair market value. CCFC then quickly resold the loans and reaped a $20.2 million gain on the transaction. The bulk of the $36.7 million balance represented profits from the sale of loans by CCFC that were owed to Superior. The OTS listed this receivable as a

28

violation between Superior and CCFC, for engaging in transactions that were not at arm's length and for extending unsecured credit to an affiliate. This transaction was deemed by OTS to be violative of various federal regulations through the sale of assets to an affiliate at a price less than fair market value. Further, OTS examiners uncovered a series of transactions involving the bank and its holding company where the holding company appeared to benefit from terms and conditions that were not at arm's length and that were detrimental to the bank.

104. Plaintiffs believe that the OTS determined that the aforementioned transaction violated various federal regulatory provisions believed to include, *inter alia*, 12 CFR Section 563.41(c), 12 CFR Section 563.41(e), and 12 CFR Section 563.42, which requires that transactions with affiliates be on terms and under circumstances that are substantially the same, or at least as favorable to the association, as those prevailing at the time for comparable transactions with non-affiliated companies.

105. On March 30, 2001, as reported in the "Material Loss Review of Superior Bank" and elsewhere, CCFC made a temporary capital infusion into Superior Bank in order to keep the institution above the "critically undercapitalized" PCA category pending completion of the Capital Plan. CCFC transferred to Superior Bank its beneficial interest in residual assets in seven securitization pools with an estimated value of $81 million.

106. Further, on May 7, 2001 OTS demanded that CCFC repay the $36.7 million receivable owed Superior Bank. CCFC refused to repay until the Capital Plan was implemented.

107. According to the OTS Director's testimony before the Senate Committee on Housing, Banking, and Urban Affairs, on May 24, 2001 OTS approved the Capital Plan submitted by Superior Bank on March 14, 2001. The PCA Capital Plan essentially provided for

the sale of the Superior Bank's retained interest portfolio to an entity to be owned, but not controlled by the Pritzkers, to be known as Newco. The Capital Plan included a cash infusion of $270 million by the Pritzkers and Dwormans. The Pritzkers would contribute $210 million and the Dwormans would contribute $50 million, with CCFC itself contributing $10 million. OTS also received joint and several guarantees of up to $100 million by eight of the various holding companies and several family trusts. The FDIC chief testified before the Senate Committee inquiring into the Superior Bank failure that it appeared that the Bank would have an opportunity to begin to stabilize if the capital plan was implemented as presented.

108. According a December 11, 2001 report in the Washington Post by staff writer Kathleen Day, the Pritzker and Dworman interests were blaming each other for the bank's problems during the time leading up to the tentative agreement regarding a rescue plan that would satisfy regulators.

109. Superior Bank was apparently working toward the implementation of the Capital Plan, until July 16, 2001 when the Pritzkers sent a letter to the OTS informing the OTS that they no longer believed in the projections used in developing the Capital Plan and would not support it, meaning, that they would not fulfill their obligations under the Plan. The Pritzkers advised OTS that they did not believe that the capital plan would work and therefore withdrew their support for their commitment to the $270 million recapitalization plan.

110. Further, according to the Associated Press on November 2, 2002, E&Y blamed Superior Bank's collapse on the thrift's failure to follow through on the recapitalization plan and the deterioration of the economy.

111. The OTS's July 21, 2001, response to the Pritzker's July 16 letter indicated that,

even under the most extreme case set forth in the Pritzker's modified projections, it appeared that their concerns would not be an issue until many years later. OTS's correspondence concluded with the demand that the Pritzkers fulfill their obligations under the capital plan.

112. When the owners failed to implement the Capital Plan in July 2001, OTS deemed Superior's equity to be insolvent by $125.6 million. The adjustments were necessitated after OTS and FDIC examiners determined earlier in the year that Superior had overstated the value of residual assets by $150 million due to overly optimistic assumptions used in the valuation models.

113. Another material adjustment precipitating insolvency arose from the aforementioned $36.7 million receivable due from CCFC. In the second half of 2000, Superior sold loans to the holding company. CCFC, in turn, sold the loans at a higher price than that paid to Superior. After deeming the transaction improper, OTS required CCFC to repay Superior, but payment was delayed reportedly due to a cash shortage at CCFC. Ultimately, recouping the $36.7 million had become dependent on the defendants implementing the Capital Plan, which did not materialize. This led to Superior's placement in the "critically undercapitalized" PCA category.

114. Further, based upon information in the February 6, 2002 "Material Loss Review of Superior Bank," Dept. of Treasury - Inspector General, plaintiff believes that CCFC was deemed in violation of 12 CFR Section 563 when it sold those loans bought from Superior at a higher price than paid to Superior.

115. On July 25, 2001 Superior's Board of directors executed an Agreement and Consent to Appointment of a Conservator or Receiver.

31

116. The FDIC February 6, 2002 Audit Report concluded that the owners' unwillingness to recapitalize the institution, coupled with the previously alleged accounting write-downs and losses, resulted in the OTS closing Superior on July 27, 2001.

117. Overall, CCFC conducted itself in a manner that demonstrated a pattern of deliberate deception and malfeasance. According to the February 6, 2002 FDIC report, CCFC was criticized by OTS in nearly every holding company examination report for activities such as dilatory filings of required regulatory reports. In at least one instance, in 1995, the delayed receipt of annual financial statements from CCFC substantially delayed completion of OTS examinations for both the thrift and the holding company.

118. Although Superior's payment of dividends to its holding company and the Defendants herein has ostensibly appeared to be within federal guidelines at the time they occurred, based on the misstated financials, the dividends paid were in fact excessive according to the FDIC's February 6, 2002 report . The FDIC found that had Superior's residual interests and O/C accounts been properly valued, these large dividend payments would have or should have had to be substantially reduced or possibly even eliminated. For example, according to the FDIC report, in the fiscal year ending June 30, 1994, the holding company received dividends from Superior totaling more than $20 million, an amount representing 146.6 percent of Superior's $13.7 million net income for the fiscal year. Further, because of losses sustained by Superior in earlier years, that dividend amount also represented 116 percent of Superior's total net income *since inception.* These excessive dividend payments to the Defendant holding company thus led to the further depletion of Superior's capital.

119. These and possibly other multiple misstatements, omissions, delays, and reneged

32

commitments constitute numerous instances of financial institution fraud (18 U.S.C. § 1344), and consumer fraud (upon depositors). Further, where these or other fraudulent acts were done by or through the United States mail, or were also mail and wire fraud (18 U.S.C. §§ 1341 and 1343, respectfully), this constituted operation of Superior Bank and CCFC by or through a pattern of racketeering.

D. The Role of Ernst & Young.

120. According to a July 28, 2001 Washington Post Article, the head of supervision for the OTS stated that the problem at Superior became as bad as it did because regulators relied on the accuracy of statements by E&Y, but that by the spring of 2001 regulators realized that the Bank's books had been maintained in a sloppy and improper manner. This questionable bookkeeping backed by the accounting firm led regulators to force E&Y to restate the Bank's earnings.

121. According to testimony by the Director of OTS before the Senate Committee on Banking, Housing, and Urban Affairs, September 11, 2001, the losses at Superior were so high largely because of the Bank's concentration in residuals. She stated that the concentration in residuals at Superior was exacerbated by a faulty accounting opinion by the Bank's external auditors that caused capital to be significantly overstated, and by management and board recalcitrance in acting on regulatory recommendations, directives and orders.

122(a). Superior's method of securitization of its subprime loans resulted in the Bank absorbing most, if not all, of the expected losses associated with the securitizations. Further, sudden changes in economic conditions or in interest rates can cause losses to mount quickly and high market valuations to disappear. Therefore, the FDIC complaint maintains, fundamental

accounting standards required that Superior's financial statements recognize these limitations and fairly value these transactions, so that Superior's financial statements could not suggest that the Bank had received payments when it had not and may never receive such payments. (Source: FDIC Complaint, ¶57)

122(b). Beginning around 1995, Superior's securitization transactions began taking the form of what are known as "Overcollateralization Structures." In order for Superior to receive the highest AAA rating on the bonds that it sold as part of its securitization transactions, a portion of the grouped mortgages was set aside in an O/C Account, which was designed to ensure that enough money was available to pay principal and interest to the bondholders of the securitizations in the event that the flow of principal and interest payments from Superior's mortgage customers was not enough to pay the bondholders. An O/C Account is known as a type of "residual interest." (Source: FDIC Complaint, ¶ 58)

122(c). Superior's securitization transactions also had the potential to generate cash flow resulting from the spread between the interest received from the borrowers and the interest paid to investors. In order to comply with accounting standards, including GAAP, Generally Accepted Accounting Standards ("GAAS"), and common sense, E&Y was required to value this residual interest to reflect appropriate market assumptions such as prepayment and loss rates. (Source: FDIC Complaint, ¶ 60)

122(d). It was critical for Superior Bank to accurately project cash flows from its mortgage customers, considering factors such as default and payment rates, so that Superior would know how to estimate the fair value of its residual interests. This process is known as cash flow modeling and, with respect to the O/C Accounts, would provide an estimate of how

34

much risk there was to the O/C Accounts and when they would no longer be necessary. To do this, Superior used Fintek, Inc., a company that also was owned by Superior's holding company CCFC. Throughout its engagement, E&Y wrongfully failed to appreciate the lack of independence between Superior and Fintek, and failed to perform an appropriate evaluation of the models used by Fintek to value Superior's residual interests. (Source: FDIC Complaint, ¶ 61)

122(e). Beginning in 1995, when Superior began its Overcollateralization Structures, E&Y engaged in auditing and consulting services regarding those transactions. Instead of giving Superior the scrutiny it deserved, E&Y instead attempted to limit its exposure for the wrongful conduct directed toward Superior by inserting in 1996 an arbitration provision into one of its engagement letters with Superior, seeking to preclude public litigation through confidential binding arbitration without the availability of punitive damages. (Source: FDIC Complaint, ¶ 66)

122(f). From the beginning of E&Y's work on Superior's Overcollateralization Structures, E&Y's auditing and consulting divisions inappropriately and wrongfully performed services for Superior, including but not limited to, evaluating and recognizing Superior's O/C Accounts as bank assets at their full dollar value (as opposed to discounting them to reflect the fact that Superior was not immediately entitled to receive those monies); failing to properly value those assets by taking into consideration realistic rates of prepayment and loss; and accepting and approving Fintek's work product. (Source: FDIC Complaint, ¶ 68)

122(g). From 1995 until January 2001, E&Y repeatedly asserted false statements and representations of material facts, including, among other things, that the methodology in valuing the securitization transaction assets was correct, that E&Y's audits were performed in accordance with GAAS, that Superior's financial statements were correct and in conformity with GAAP, and

that Superior's financial statements presented fairly, in all material respects, the consolidated

financial positions of Superior. During this time, E&Y also omitted, among other things, that the

methodology in valuing the securitization transaction assets was incorrect, that E&Y's audits

were not performed in accordance with GAAS, that Superior's financial statements were

incorrect and not in conformity with GAAP, and that Superior's financial statements did not

present fairly, in all material respects, the consolidated financial positions of Superior. As a

direct and proximate result of E&Y's wrongful conduct, from approximately 1995 until January

2001, Superior's financial statements were vastly overstated in that they, among other things,

improperly recognized the O/C Accounts at face value. (Source: FDIC Complaint, ¶¶ 69, 70)

122(h). For example, at the end of the calendar year 2000, Superior's financial

statements recognized the O/C accounts as a bank asset of approximately $376 million. In

reality, however, the O/C accounts were not assets of the Bank that could be recognized at face

value according to reasonable accounting methods, accounting standards, GAAP, GAAS, and

common sense. (Source: FDIC Complaint, ¶ 71)

122(i). E&Y's auditing and consulting divisions also inappropriately and wrongfully

evaluated an asset compromised of interest savings due to early retirement bonds. When

Superior sold a group of bonds, the expected profit it would make was recorded as an asset,

representing the difference between the income it received from the group of mortgages less the

costs of issuing and retiring the bonds, among other costs. When Superior retired a portion of a

bond before its payment was due, however, E&Y also listed as a Superior asset the amount that

Superior no longer needed to pay in interest on that bond. This resulted in E&Y further

overvaluing Superior's assets relating to its securitization transactions by at least $100 million.

36

(Source: FDIC Complaint, ¶ 72)

122(j). By failing to properly value Superior's securitization transactions, E&Y's auditing and consulting divisions inappropriately and wrongfully overstated Superior's assets by hundreds of millions of dollars. This in turn caused Superior to appear to be extremely profitable in later years when in fact it actually was losing substantial amounts of money. (Source: FDIC Complaint, ¶ 73)

122(k). Furthermore, despite the longstanding mandatory accounting practice of recognizing residual assets at their "fair value," as well as other specific accounting requirements relating to the valuation of residual assets, including but not limited to the aforementioned SFAS 125, E&Y nevertheless inappropriately and wrongfully approved Superior's financial statements, and failed to properly value Superior's securitization transactions. This resulted, according to the FDIC complaint, in a massive overvaluation of Superior's assets and the eventual demise of Superior Bank. (Source: FDIC Complaint, ¶¶ 74-86)

122(l). Additionally, E&Y improperly overvalued Superior's securitization transactions despite E&Y's knowledge of various factors demonstrating that Superior's securitization transactions deserved closer scrutiny, including but not limited to Superior's engagement in subprime lending, Superior's use of Fintek to model anticipated cash flows from its securitization transactions, and Superior's alarmingly high return on assets. E&Y failed to give Superior the scrutiny required by GAAP, GAAS and federal law regarding annual audits of insured depository institutions. (Source: FDIC Complaint, ¶¶ 4, 5, 87)

123. The OTS director testified before the Senate Committee on Housing, Banking, and Urban Affairs that OTS's experience with Superior highlights a number of accounting and

37

financial reporting issues. Specifically, she expressed that the independent role of external auditors and their training and experience with complex financial instruments and transactions are issues raised by the OTS's experience with Superior.

124. According to a February 12, 2002 Knight Ridder/Tribune article, E&Y also received non-audit consulting fees from Superior which totaled at least twice as much as the fees it received for its accounting services. The source for this information, the inspector general for the FDIC, stated that this was a direct conflict of interest.

125(a). E&Y's misconduct was exacerbated by rampant conflicts of interest in the valuation of Superior's assets. Even while E&Y's consulting division was called upon to provide a cursory review of E&Y's auditing division, E&Y's auditors continued to misrepresent Superior's financial condition. This conflict of interest eliminated any of the independence required by long-standing accounting practices and federal law. Regarding this conflict of interest, E&Y's Vice President Jim Barrett has recognized that "It's obvious that using an auditing firm to do consulting is putting yourself at unnecessary risk." (Source: FDIC Complaint, ¶¶ 2, 9, 11, 52)

125(b). E&Y delayed disclosure of Superior's true financial condition while E&Y's consulting arm was engaged to "bless" the conclusions of E&Y's auditors during the time that disclosure of a $270 million error would have adversely affected negotiations for an $11 billion sale of E&Y's consulting practice to a French consulting firm, Cap Gemini. During this period, E&Y continued to approve the misstatement of Superior's securitization transaction assets and, therefore, its financial condition. (Source: FDIC Complaint, ¶¶ 2, 6)

125(c). For example, per the FDIC complaint, in or about October of 1999, E&Y began a

special project evaluating whether Superior's residual assets were appropriately valued. E&Y's consulting division, including its Structured Finance Services Group in the New York National Office, was brought in for the purported purpose of providing an "independent" review of the residual valuation methodology and conclusions. However, E&Y's conflicts of interest prevented it from revealing the magnitude by which its prior wrongful accounting misstated the financial condition of Superior without adversely impacting the intended sale of its consulting division. During the course of this project, E&Y manufactured its own "conservative" and "reasonable outcome" by performing an extremely limited review of Superior's securitization transactions to rubber stamp the work of the audit group. E&Y also examined only 1 of Superior's 23 securitization transactions and relied on an outdated market survey. Not surprisingly, at the end of this process E&Y's auditing division continued to misrepresent Superior's financial condition. (Source: FDIC Complaint, ¶¶ 9, 101)

125(d). E&Y subsequently examined another of the Bank's securitization transactions and found that there was a $10 million difference between its own cash-out analysis and the amount of the residuals actually being carried on Superior's financial statements. Despite this significant discrepancy, E&Y failed to examine any of Superior's other securitization transactions. E&Y further acknowledged that it did not even review the most recent regulator's report of Superior, despite this fundamental requirement. (Source: FDIC Complaint, ¶ 102)

125(e). In order to ensure that the Cap Gemini transaction took place, E&Y took additional action to ensure that its improper valuation of Superior's assets remained concealed for a safe period after the sale was consummated to prevent any adverse effect on the financial interest it retained in the sale. On May 9, 2000, E&Y wrote a letter to the Audit Committee of

39

the Board of Directors of Superior. Although E&Y long knew that Superior's assets were massively overvalued, E&Y misleadingly stated: "Additionally, in the conduct of our audit of the financial statements of the Bank as of June 30, 1999 we performed audit procedures related to financial receivables held by the Bank sufficient to conclude that the carrying value of this asset as of the audit date approximated fair value in all material respects in accordance with (SFAS 125)." E&Y expressly recognized in the letter that it was the "philosophy of the Bank" to "be ahead of the curve" in adhering to accounting standards. E&Y then wrote, "the Bank wishes to evaluate its current method of establishing those assumptions key to the financial receivable valuation process to assure compliance with the revised standards." Thus, E&Y expressly recognized Superior's desire to have E&Y comply with relevant standards in accounting for Superior's assets. E&Y, however, had long been purporting to evaluate, since at least October 1999, the accounting assumptions used to determine fair value of Superior's retained interests. E&Y ultimately billed Superior at least $650,000 to conduct this analysis and a restatement of Superior's assets, both of which would not have been necessary if E&Y had properly accounted for Superior's assets from the beginning. (Source: FDIC Complaint, ¶ 105)

125(f). Most significantly, E&Y wrote in the May 9, 2000 letter that it should have "no responsibility for adverse economic effects resulting in the marketplace or adverse regulatory reaction to the proposed methodology changes if and when implemented." This was exactly the responsibility, and the adverse economic impact on E&Y, that E&Y feared and sought to delay. (Source: FDIC Complaint, ¶ 106)

125(g). Only after the sale to Cap Gemini, and without any change in the applicable financial auditing standards, did E&Y concede that its accounting treatment of Superior's

financial statements was improper. It is further alleged that this January 11, 2001 admission by E&Y representatives to the FDIC came three weeks after E&Y claimed to have first involved its National Office in reviewing its prior auditing work for Superior. In reality, the National Office's alleged "three week review" was done to mask its longstanding knowledge of the overvaluation of Superior's assets. (Source: FDIC Complaint, ¶¶ 8, 13, 112)

125(h). The sale of E&Y's consulting division to Cap Gemini provided a windfall to E&Y of more than $6 billion. (Source: FDIC Complaint, ¶ 107)

126. Further, on information and belief, both the Pritzkers and Dwormans have blamed the Bank's collapse in large part on the accountants, E&Y, whose reports they say they relied upon.

127(a). E&Y has long been a primary auditor for significant business interests of the Pritzker family. Beginning in approximately 1990, E&Y began auditing Superior Bank. (Source: FDIC Complaint, ¶¶ 45, 47, 48)

127(b). Each year from 1990 through 2000, E&Y issued a "Report of Independent Auditors" stating that Superior Bank's financial statements for that year were audited in accordance with GAAS; that the audit had been conducted in conformity with GAAP; and that the financial statements "present fairly, in all material respects, the consolidated financial position of Superior Bank FSB..." For each year from 1990 through 2000, E&Y's "Report of Independent Auditors" regarding Superior Bank was "unqualified," which according to accounting and auditing standards can only be issued if the financial statements present fairly, in all material respects, the financial position, results of operations, and cash flows of the entity in conformity with GAAP. (Source: FDIC Complaint, ¶¶ 49, 50)

127(c). However, during 1998, 1999, and 2000, while E&Y was auditing Superior and reporting on the Bank's financial condition, E&Y was also providing lucrative consulting services on various Superior matters. E&Y's provision of auditing and consulting services on various Superior matters placed E&Y in a direct conflict of interest in that one E&Y division was called upon to review and approve another E&Y division's work product. This prevented E&Y audits from being "independent" as required by federal law and accounting and auditing standards. (Source: FDIC Complaint, ¶¶ 9, 51)

127(d). E&Y's admissions to the FDIC that its annual financial audits of Superior Bank were erroneous followed a lengthy period of denial and resulted in a $270 million reduction of the bank's assets. Further investigation revealed the need for an additional $150 million reduction in the bank's assets. Additionally, as a result of E&Y's misstatement of Superior Bank's assets, the bank became insolvent which ultimately required the FDIC to pay out in excess of $750 million from the Federal Insurance Deposit Fund. (Source: FDIC Complaint, ¶¶ 1, 113)

127(e). E&Y has a long history of breaching duties owed to the FDIC and other regulatory agencies overseeing financial institutions. Over the last approximately 11 years, E&Y's auditing work has been the subject of accusations by both the SEC and OTS. (Source: FDIC Complaint, ¶¶ 3, 36, 37)

127(f). E&Y's fraudulent conduct in connection with Superior's failure went all the way to E&Y's National Office in New York City. Not only did E&Y's National Office know of the improper accounting treatment that its local office was performing for Superior Bank, but as regulators increasingly scrutinized the work of E&Y's local office, E&Y's National Office failed

42

to disclose E&Y's wrongful accounting until after the sale of E&Y's consulting division was completed. (Source: FDIC Complaint, ¶¶ 7, 8)

127(g). E&Y long knew that it was overvaluing Superior's residual assets. E&Y's accounting and consulting divisions, however, refused to recognize their improper valuation because they did not want to criticize each other, because E&Y did not want to adversely affect its relationship with the Pritzkers, and because E&Y did not want to compromise the sale of E&Y's consulting division to Cap Gemini. (Source: FDIC Complaint, ¶ 88)

128. E&Y owed a duty of accurate reporting that runs to actual and potential depositors of the Bank.

129. E&Y represented itself to the FDIC, Superior Bank, and the public as an expert providing professionally competent services in accounting, auditing and management advisory matters, and as a specialist in the financial services industry and, specifically, mortgage securitization. (Source: FDIC Complaint, ¶ 34)

130. The outcome of the FDIC v. Ernst & Young Suit. As stated above in ¶¶ 27, 88-89, on or about December 10, 2001 the FDIC entered into an agreement with Pritzkers and Dworman absolving them of any potential liability of $900 million ($600 million initial package plus $180 million in unearned dividends plus Dworman's $100 million loan), in exchange for: (a) $460 million, of which only $100 million was paid in cash, and the remaining $360 million promised to be paid, without interest, over a fifteen year period, plus (b) an agreement to jointly sue Ernst & Young, the Bank's accountants, in violation of the priorities set out by federal law and regulations by putting the former owners ahead of Bank Depositors by guaranteeing the Pritzkers 25% of "any and all Case Proceeds recovered by any Agency Party in respect of the E&Y

claims..., and 50% of the "amount, if any, by which (i) all civil money penalties recovered in respect of the E&Y Claims through an action by the OTS exceed (ii) five percent (5%) of the Case Proceeds theretofore recovered by any Agency Party in respect of the E&Y Claims..." The FDIC did indeed file suit against E & Y in its corporate capacity.

130(a). Ernst & Young challenged the FDIC's ability to bring a suit in its corporate capacity, stating that this route was nothing more than a ruse to avoid the mandatory arbitration clause contained in E & Y's engagement letter. E & Y, as well as the Court, raised further concerns during oral arguments regarding the lack of adequate protection of the uninsured depositors. See <u>FDIC v. Ernst & Young LLP</u>, 02 C 7914, slip op. at 3,10 (N.D. Ill. April 15, 2003)(Gettleman, J.) (hereinafter *"Gettleman Opinion*, pg. ____" and attached hereto as Exhibit 2); Report of Proceedings,

130(b). The court held that FDIC did not have standing to bring suit against E & Y in its corporate capacity, stating:

> To allow such a suit to go forward would impair the statutory priority scheme outlined above, which provides that, after payment of insured depositors claims, the FDIC steps into the shoes of the depositors and is subrogated to "all rights of the depositor against the failed institution..." 12 U.S.C. § 1821 (g). As subrogee of the insured depositors, the FDIC in its corporate capacity joins the uninsured depositors as first in line to be paid, after secured claims and administrative expenses. 12 U.S.C. § 1821 (d)(11)(A). Permitting the FDIC to proceed with the instant suit in its corporate capacity would, as E & Y argues, "enable the FDIC to bypass the statutory priorities at will, taking whatever it could recover for itself, outside of the receivership process, and leaving nothing for creditors with a right to equal or greater priority."

> Apparently recognizing that maintenance of the instant suit would threaten to undermine the rights of other depositors and creditors, the FDIC asserts, "The FDIC is bringing this case to, among other things, recover the loss to the insurance fund. Assuming the successful conclusion of this case, the FDIC will properly pay the recovery in this matter according to the required statutory priority scheme." Such voluntary assurances, in the absence of a

statutory directive to the same effect, do not assuage the court's concerns about the disruption to the priority described herein, however.

*Gettleman Opinion*, pg. 10-11.

130(c).    Thus, only plaintiffs herein possess unalloyed standing to assert these claims of the depositors to void the agreement between the FDIC and the Pritzker/Dworman group as against federal law and preserve for depositors the proceeds which the FDIC has illegally allocated to the Pritzker/Dworman group.

E. Class Action Allegations.

131.    Numerosity.  The members of the Class are so numerous and geographically dispersed that joinder of all members is impracticable.  While the exact number of Class members is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are approximately one thousand members of the Class, person and entities who had uninsured deposits with Superior Bank at the time the OTS appointed the FDIC as Receiver, whose losses presently appear to be $33 million to $46 million.

132.    Commonality.  Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are whether Defendants violated the Illinois Consumer Fraud and Deceptive Business Practices Act and/or the Racketeering Influenced and Corrupt Organizations Act as alleged herein, in;

      a.    misrepresenting and/or omitting material facts about Superior's financial condition and the insured status of deposits;

      b.    participating directly or indirectly in the conduct of an enterprise's affairs, or were associated with, or otherwise constituted an enterprise;

c.     participation in said enterprise through a pattern of racketeering activity;

and resulting issues of the damages suffered by members of the class, the proper measure of

damages, and the appropriate relief, including trebling of damages plus costs and reasonable

attorneys fees..

133.     Typicality. Plaintiffs' claims are typical of the claims of the members of the Class

because the Plaintiffs and members of the Class sustained damages arising out of Defendants'

wrongful conduct in violation of state law as complained of herein.

134.     Adequate Representation. Plaintiffs will fairly and adequately protect the interests

of the members of the Class and have retained counsel competent and experienced in class actions.

Plaintiffs have no interests, antagonistic to or in conflict with, those of the Class.

135.     Superiority. A class action is superior to other available methods for the fair and

efficient adjudication of the controversy since joinder of all members of the Class is impracticable.

Furthermore, because the damages suffered by the individual Class members may be relatively small,

the expense and burden of individual litigation makes it impracticable for the Class members

individually to redress the wrongs done to them. Plaintiffs anticipate no difficulty in the

management of this action as a class action.

## CAUSES OF ACTION

### COUNT I
### Violation of the Illinois Consumer Fraud Act, 815 ILCS 505/2

136.     Plaintiffs incorporate by reference and reallege each and every foregoing allegation

of the complaint, as if fully set forth herein.

137.     At all relevant times, there was in full force and effect in Illinois the Consumer

46

Fraud Act, 815 ILCS 505/1, *et seq.*

138. Section 2 of the Consumer Fraud Act, 815 ILCS 505/2 provides in pertinent part:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact, or the use or employment of any practice described in Section 2 of the 'Uniform Deceptive Trade Practices Act', approved August 5, 1965, in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been mislead, deceived or damaged thereby. In construing this section consideration shall be given to the interpretations of the Federal Trade Commission and the federal courts relating to Section 5(a) of the Federal Trade Commission Act.

139. The Uniform Deceptive Trade Practices Act, 815 ILCS 510/1, *et seq.*, provides at Section 2, 815 ILCS 510/2, in pertinent part:

> § 2.    A person engages in a deceptive trade practice when, in the course of his business, vocation or occupation, he:
>
> * * *
>
> (12) engages in any other conduct which similarly creates a likelihood of confusion or of misunderstanding.

* * *

140. Section 10a of the Consumer Fraud Act, states, in pertinent part:

> (a)    Any person who suffers damage as a result of a violation of this Act committed by any other person may bring an action against such person. The court, in its discretion may award actual damages or any other relief which the court deems proper. Proof of public injury, a pattern, or an effect on consumers generally shall not be required.
>
> * * *

(c)     Except as provided in subsection (f), (g) and (h) of
this Section, in any action brought by a person under this
Section, the Court may grant injunctive relief where
appropriate and may award, in addition to the relief provided
in this Section, reasonable attorney's fees and costs to the
prevailing party....

141.    A deceptive act or practice. Defendants knowingly or recklessly participated or

assisted in the deceptive act or practice by knowingly or recklessly providing false financial

statements regarding the financial condition of the bank and erroneous legal advice regarding

FDIC insurance coverage.

142.    Defendants who were or are officers and directors of Superior Bank, are

responsible for establishing, supervising, directing, and controlling the business activities,

practices and policies of Superior Bank including;

a. the policy and practice of misrepresenting the amount of FDIC insurance coverage on

deposits; and

b. the policy and practice of inducing Plaintiffs and the Class to deposit funds in excess

of FDIC insurance coverage.

143.    Intent on the Defendant's part that the Plaintiffs rely on the deception.

Defendants statements were intended to be relied upon by Plaintiffs and the Class.

144. Defendants who did not make the actual statements, were, by their actions

described, nonetheless responsible for the misstatements, as aiders and abettors. By its

involvement in preparing and auditing Superior's financial statements, upon which these

misstatements were made with respect to Superior's financial condition, Ernst & Young is liable

as either a principal or as an aider and abetter in this count.

145.    Defendants' wrongful conduct, as alleged herein, occurred in trade and

48

commerce and caused damages to Plaintiffs and the Class.

146.    As detailed herein, all of the Defendants are jointly and severally liable for plaintiffs' and the class' damages suffered from being wrongfully induced, in violation of the Consumer Fraud Act, to deposit, or leave on deposit, money in Superior that could not be recovered following the Bank's closing.

## COUNT II–AGAINST CCFC DEFENDANTS AND ERNST & YOUNG
### Violation of the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962(c)

147.    Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully contained herein.

148.    At all times relevant to this Complaint, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961, *et seq.*, was in full force and effect.

149.    **Defendants are "Persons".** At all times relevant to this Complaint, Defendants Penny S. Pritzker, Thomas J. Pritzker, Alvin Dworman, CCFC and Ernst & Young LLP are "persons" within the meaning of 18 U.S.C. § 1961 (3).

150.    **Applicable enterprises.** At all times relevant to this complaint, CCFC and Superior Bank, each, constituted an "enterprise", as that term is defined in 18 U.S.C. § 1961(4), whose activities were involved in or affected interstate commerce, and whose business utilized the United States mail, and whose business was conducted by one or more of the defendants, alone and in concert, by a pattern of racketeering activity, as that term is defined by 18 U.S.C. § 1961(1).

151.    **Use of Mails**. The Defendants Penny S. Pritzker, Thomas J. Pritzker, Alvin

49

Dworman, CCFC and Ernst & Young LLP, along with the now defunct Superior Bank, knowingly caused the mail to be used in furtherance of the foregoing schemes, in violation of 18 U.S.C. § 1341. Upon information and belief, mails were a critical part and used to and for: (a) send information regarding the low interest rates; (b) send information regarding the status of the bank financially; (c) communications between the Defendants regarding the financial status of the bank; (d) send document relating to the various violative loans distributed by the bank; (e) the payment of dividends to the Defendants; (f) send information regarding the auditing and review of the financial condition of the bank by the Accountant Defendants; and (f) any other communications, document transfers, or sent information in furtherance of the above described schemes.

152.     **Financial Institution Fraud**. Each withdrawal of money from Superior by the improper loans to Dworman and to UBH, or the dividends withdrawn from the bank under cover of the materially false financial statements of Superior, would likely also constitute financial institution fraud, as defined by 18 U.S.C. § 1344, which, while it may not have induced deposits, nonetheless damaged plaintiffs and class members by reducing the assets available to them when the bank closed.

153.     **Use of Wires**. The Defendants Penny S. Pritzker, Thomas J. Pritzker, Alvin Dworman, CCFC and Ernst & Young LLP, along with the now defunct Superior Bank, knowingly caused interstate telephone systems to be used in furtherance of the foregoing schemes, in violation of 18 U.S.C. § 1343. Upon information and belief, wire was a critical part and was used to and for: (a) transfer of documents to and from Defendants regarding the financial conditions of the bank; (b) communications between the parties via e-mail regarding the financial

conditions of the bank; (c) discussion, either via facsimile or e-mail, regarding the large loans given to Mr. Dworman, or for other forms of self dealing; (e) send information regarding the auditing and review of the financial condition of the bank by the Accountant Defendants; and (f) any other communications, document transfers, or sent information in furtherance of the above described schemes.

154.    **Racketeering Activity**. Each such use of the mails and/or wire in furtherance of schemes constitutes mail fraud, in violation of 18 U.S.C. § 1341, wire fraud (18 U.S.C. § 1343) or financial institution fraud (18 U.S.C. § 1344) and in turn is a "racketeering activity" within the meaning of 18 U.S.C. § 1961(1).

155.    **Pattern of Racketeering Activity**. The acts of racketeering activity, consisting at least in the continuing mailings to and from thousands of consumers, both the Plaintiff, and upon knowledge and belief, many others, as well as between the various defendants, constitutes a "pattern" within the meaning of 18 U.S.C. § 1961(5).

156.    . The CCFC Defendants, namely the Pritzkers and Mr. Dworman, by and through their holding company CCFC, utilized the moneys placed into Superior by the depositors as if it was their own. In the 1990's, the CCFC Defendants received over 200 million dollars in dividends from Superior, paid into CCFC. Mr. Dworman received somewhere between a 70-130 million dollar loan that was never subsequently paid off. In 1996, CCFC made a $70 million loan to UBH, Inc., one of the holding companies that owned CCFC. In the meantime, unassuming depositors like the Plaintiff and class members, were being invited to put their money into the CCFC Defendants vacuum, lured in by illusory interest rates, and assured of the bank's financial stability, as well as the backing of a good family name like the Pritzkers.

157.    Further, all of this activity was never reported, never illustrated, and never revealed in the Bank's financial statements, audit reports and/or opinion letters compiled by Ernst & Young. Ernst and Young highly overvalued the capital of the bank, including overvaluing the assets by hundreds of millions of dollars. In addition, Ernst & Young was conducting both the auditing as well as the consulting for Superior, creating a conflict of interest and a violation of the "independent" review standard under federal law. Thus, E&Y actively participated in the conduct of the enterprise by conducting these activities that were necessary and/or helpful to the enterprise.

158.    The defendants, thus individually and in concert, thus violated 18 U.S.C. § 1962(c), by causing Superior Bank (as one enterprise) and CCFC (as another enterprise) to each be conducted through a pattern of racketeering activity:

> It shall be unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate of foreign commerce, to conduct or participate directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

159.    As a direct and proximate result of the forgoing violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class have been injured in their business, property, or both, from defendants' conducting the enterprise in the described fashion, and are thus entitled to recover their damages sustained, trebled, plus the costs of this suit, including a reasonable attorney's fee.

## COUNT III– AGAINST ERNST & YOUNG
### Violation of Section 30.1 of the Illinois Public Accounting Act

160.    Plaintiffs incorporate by reference all of the foregoing paragraphs as if fully contained herein.

161.     At all times relevant to the Complaint, 225 ILCS 450/30.1 was in full effect and

force. Under Section 30.1 of the Illinois Public Accounting Act:

> No person, partnership of corporation licensed or authorized to practice under this Act or any of its employees, partners, members, officers or shareholders shall be liable to persons not in privity of contract with such person, partnership or corporation, for civil damages resulting from acts omission, decisions or other conduct in connection with professional services performed by such persons, partnership or corporation, except for:
>
>> (1) such acts or omissions, decisions or conduct that constitute fraud or intentional misrepresentations, or
>> (2) such other acts, omissions, decisions or conduct, if such person, partnership or corporation was aware that a primary intent of the client was for the professional services to benefit or influence the particular person bringing the action; provided, however, for the purposes of subparagraph 2, if such person, partnership or corporation (i) identifies in writing to the client those persons who are intending to rely on the services, and (ii) sends a copy of such writing or similar statement to those persons identified in the writing or statement, then such person, partnership or corporation or any of its employees, partners, members, officers, or shareholders may be held liable only to such persons intended to so rely, in addition to those persons in privity of contract with such person, partnership or corporation.

162.     When Ernst & Young performed their audit for Superior Bank, the sole

objective of that audit was to issue an opinion as to the financial stability of the bank based upon

the bank's financial statements. In doing so, they are to interpret the bank's financial statements

and determine whether they have been prepared in accordance with GAAP, GAAS, and common

sense.

163.     Further, Superior Bank's operated on two main fronts: the first was for loaning

money to potentially high-risk candidates; second, and relevant here, they issued high interest

CD's and other forms of savings. In terms of the latter, the Plaintiffs and the class deposited their money into these interest-bearing savings accounts based upon the assurance by Superior that the bank was financially secure. This assurance came with the understanding that the bank had been given a stamp of approval by its auditors and consultants.

164.    When Ernst & Young completed its review and issued its opinion as to the financial stability of the <u>bank</u> that it reviewed, it undoubtedly had knowledge that its client, again <u>a bank</u>, would be using the approval of the bank's financial statement (i.e., that the bank is financially stable both in the past, currently, and in the future) to reassure the bank's customers to place large sums of money into Superior's coffers.

165.    Further, no evidence exists that Ernst & Young attempted to limit its liability by drafting a letter stating as much. Without any limitation in writing, an accounting firm will be liable if it knew of its clients intent to utilize the faulty audit reports and financial statements it prepared and approved. Here, as stated above, Ernst & Young surely knew that a stamped approval of the bank's financial security would be utilized in attracting large deposits.

166.    Section (1) holds accountants liable for any acts of fraud or intentional misrepresentations. Section (2) holds accountants liable for negligent misrepresentations. The elements of each offense are identical save one– to state a claim for an intentional misrepresentation, a plaintiff must allege that the Defendant knew his statement was false, whereas with a negligent misrepresentation, no such knowledge is required.

167.    Here, upon information and belief, Plaintiffs assert that Defendant Ernst & Young knew that their audits and opinion letters were inaccurate and no set of facts supported the approval of Superior's financial statements.

54

168. At the very least, Ernst & Young's action amount to negligent misrepresentations, and liability exists under Section 30.1 (2) of the Illinois Public Accounting Act.

169. Because Ernst & Young failed to exercise reasonable care, and because they breached their professional duty as auditors to the uninsured depositors, Plaintiffs and member of the class, by relying on the rubber-stamped approval of Superior's stability, suffered pecuniary loss when the reality of the banks crumbling financial foundation was revealed.

## COUNT IV-- AGAINST ERNST & YOUNG
### Aiding and Abetting a Violation of RICO

170. Plaintiffs incorporate by reference all of the foregoing paragraphs 1-145 as if fully contained herein.

171. As an alternative count to Defendant Ernst & Young's role in the RICO scheme, Plaintiffs allege, at the very least, Ernst and Young is liable for its role in the scheme as an aider and abettor.

172. Under Illinois law, a person is liable for aiding and abetting if a Plaintiff establishes: (1) the commission of an independent wrong committed by the primary offender; (2) the rendering of substantial assistance by the aider and abettor; and (3) the requisite scienter of the aider and abettor.

173. Here, as stated above, the primary wrong was committed by *at least* Superior, its officers and directors, its holding company, CCFC, and the member of the CCFC group, the Pritzkers and Mr. Dworman. Through their actions, Plaintiffs and members of the class were injured.

174. If this Court determines that Ernst & Young did not play a primary role in this

scheme, then, at the very least, they contributed to the scheme by reviewing clearly fraudulent statements provided by Superior, overvaluing the assets of Superior by millions of dollars, and rubber stamping the economic stability of the bank through their audits and opinion letters. Further, the only review of Ernst & Young's work was through the consulting division of the *same firm.* This assistance created the appearance of a financially healthy bank and contributed to the moneys deposited by the unknowing plaintiffs and other members of the class.

175.    Plaintiffs further allege, upon information and belief, that Defendant Ernst & Young knew of the underlying scheme to create an apparently stable bank to lure in unassuming depositors. Through their review of the financial statements of Superior, they had knowledge of the self dealing via loans to an officer of Superior's holding company, as well as another loan to a related holding company. Further, Ernst & Young overvalued the assets of Superior by *hundreds of millions of dollars.* Although armed with the knowledge of Superior's strange dealings and inflated worth, Ernst & Young continued to rubber stamp audit reports, assisting in the furtherance of the scheme.

176.    As a direct and proximate result of Ernst & Young's aiding and abetting violations of 18 U.S.C. § 1962(c), Plaintiffs and the Class have been injured in their business, property, or both, from defendants' conducting the enterprise in the described fashion, and are thus entitled to recover their damages sustained, plus the costs of this suit, including a reasonable attorney's fee.

### COUNT V– AGAINST THE PRITZKERS, DWORMAN AND THE FEDERAL DEPOSIT INSURANCE CORPORATION
#### Declaratory Judgment

177. Under 12 U.S.C. § 1821 (d) (11) (A), Congress established a priority scheme

requiring the FDIC to step into the shoes of the Bank to recover funds on behalf of the Plaintiff

and class members-- the uninsured depositors, who are entitled to an absolute statutory priority

over the owners of the bank under § 1821 (d)(11)(A), which states:

(11) Depositor Preference
(A) In general

Subject to section 1815(e)(2) of this title, amounts realized from the liquidation or other resolution of any insured depository institution by any receiver appointed for such institution shall be distributed to pay claims (other than secured claims to the extent of any such security) in the following order of priority:
(i)     Administrative expenses to the receiver.
(ii)    Any deposit liability of the institution.
(iii)   Any other general or senior liability of the institution (which is not a liability described in clause (iv) or (v)).
(iv)   Any obligation subordinated to depositors or general creditors (which is not an obligations described in clause (v)).
(v)    Any obligation to shareholders or members arising as a result of their status as shareholders or members (including any depository institution holding company or any shareholder or creditor of such company).

178.  Thus, the depositors are entitled to have the entire amount of the Bank's deposit

liability returned to them in full before **any** money can be distributed to owners such as the

Pritzkers and Dworman.

179.  By acting in its corporate capacity, as it has a right to under 12 U.S.C. §§ 1811,

1821 (a), (f), the FDIC placed itself and the shareholders and member of the Bank

(Prtizker/Dworman group) at a higher priority level than the uninsured depositors, in clear

violation of § 1821 (d) (11) (A).  As stated in Judge Gettleman's opinion, this usurps the FDIC's

statutory responsibility to the Plaintiff and class members.

180. Further, by entering into a contract with the Pritzker/Dworman group in its corporate capacity to allocate some of the funds from any recovery to the Pritzkers and Dworman, the FDIC jeopardizes any potential recovery that statutorily is mandated for the class members by agreeing to first distribute it to the Pritzkers.

181. Because this agreement violates statutory preference to the class members, Plaintiffs and the class members now seek to have this Court declare the agreement null and void as violative of public policy, enjoin the parties from allocation any of the proceeds paid to the Pritzkers/Dworman, declare that the underinsured depositor class is entitled to the Prtizker/Dworman share at least until the depositors have been fully repaid with all appropriate interest and net deposits, and impose a constructive trust, lien or other equitable device, in favor of the bank's underinsured depositors, over any proceeds recovered by any FDIC action against E & Y that would otherwise be payable to the Pritzker/Dworman group under the FDIC's agreement with them.

## PRAYER FOR RELIEF AND JURY DEMAND

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the Class, pray for judgment as follows:

A. Declare this action to be a proper class action and certify Plaintiffs as Class representatives under 735 ILCS 5/2-802;

B. Award damages in favor of Plaintiffs and the Class against all Defendants for the damages sustained as a result of Defendants' wrongdoing together with interest thereon;

C. Award Plaintiffs the fees and expenses incurred in this action, including reasonable allowance of fees for Plaintiffs' attorneys, and experts;

D.  Alternatively, grant Plaintiffs their Attorney's fees and costs as appropriate in view of the relief granted and as required under 12 U.S.C. § 1975 and 18 U.S.C. § 1964(c);

E.  Declare that the Bank Defendants have violated the Illinois Consumer Fraud and Deceptive Business Practices Act;

F.  Declare that Defendants have violated the Racketeering Influenced and Corrupt Organizations Act;

G.  Declare that Accountant Defendants Ernst & Young have violated Section 30.1 of the Illinois Public Accounting Act;

H.  Declare that Accountant Defendants Ernst & Young, in the alternative, have aided and abetted the remaining Defendants violation of 18 U.S.C. § 1962 (c).

I.  Declare the settlement entered into between the Pritzkers and the FDIC to be null and void as violative of public policy, and impose a constructive trust, lien or other equitable device, in favor of the bank's underinsured depositors, over any proceeds recovered by any FDIC action against E & Y that would otherwise be payable to the Pritzker/Dworman group under the FDIC's agreement with them.

J.  Direct Defendants, jointly and severally, to account for all losses and/or damages sustained by Plaintiffs and the Class and by reason of the acts and omissions complained of herein;

K.  Award Plaintiffs jointly and severally, pursuant to 18 U.S.C. Section 1964(c), treble damages as persons injured in their business or property by reason of the Defendant's violation of RICO Section 1962;

L.  Award pre-judgment and post-judgment interest as allowed by law;

M.  Grant such other and further relief as this Court may deem just and proper.

Dated: May 22, 2003

*Filing 7/2/03 Date*

Respectfully submitted,

*Clint Krislov*

Clinton A. Krislov
Attorney for Plaintiffs

*Clint Krislov, Re-signed on 7/2/03 following Court's grant of leave 7/2/03 to file Fourth Amended Complaint. CAK 7/2/03*

Clinton A. Krislov
KRISLOV & ASSOCIATES, LTD.
20 North Wacker Drive
Suite 1350
Chicago, IL 60606
(312) 606-0500
(312) 606-0207 (fax)

Jeff Friedman
FRIEDMAN & HOLMAN
Three First National Plaza
Suite 5050
Chicago, Illinois 60602
(312) 357-0445
(312) 332-9791 (fax)

George B. Collins
COLLINS & BARGIONE
One N. LaSalle, Suite 2235
Chicago, Illinois 60602
(312) 372-7813
(312) 372-7840 (fax)

*Attorneys for Plaintiffs*

RECEIVED

MAY 22 2003

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

60

See Case File for
Exhibits