# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 6926 | **DATE** | 9/14/2004 |
| **CASE TITLE** | Courtney, et al. vs. Halleran, et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] Enter Order. Defendants' respective motions to dismiss [47-1], [51-1], [52-1], and [53-1] are each granted. Terminating Case.

(11) ■ [For further detail see order attached to the original minute order.]

| | | | Document Number |
|---|---|---|---|
| | No notices required, advised in open court. | | |
| | No notices required. | number of notices | |
| | Notices mailed by judge's staff. | SEP 17 2004 | |
| | Notified counsel by telephone. | date docketed | 74 |
| X | Docketing to mail notices. | | |
| X | Mail AO 450 form. | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | |
| RJ/TL | courtroom deputy's initials | 2004 SEP 16 PM 4:23 U.S. DISTRICT COURT | date mailed notice |
| | | Date/time received in central Clerk's Office | mailing deputy initials |

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | |
|---|---|
| JOHN W. COURTNEY, FRANCES T. LAX, LAWRENCE M. GREEN, and IRENE L. KORTAS, on behalf of themselves and others similarly situated, | Case No. 02-C-6926 |
| Plaintiffs, | Judge Joan B. Gottschall |
| vs. | |
| NEAL T. HALLERAN, et al., | DOCKETED SEP 1 7 2004 |
| Defendants. | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs John Courtney, Frances T. Lax, Lawrence Green and Irene Kortas were depositors of Superior Bank FSB ("Superior") who lost the uninsured portions of their accounts when Superior failed and was placed in receivership with the FDIC in the summer of 2001. Plaintiffs have sued Superior's holding company, Coast-to-Coast Financial Corp. ("CCFC"), along with several of CCFC's principals (with CCFC, collectively the "CCFC Defendants"), several of Superior's individual officers and administrators (the "Bank Defendants") and Superior's auditors, Ernst & Young LLP ("E&Y"), alleging that CCFC essentially plundered Superior's assets for its own profit and, using "cooked" financial statements supplied by E&Y, misrepresented the financial condition of the bank to depositors to encourage their business. Plaintiffs also claim that Superior's employees fraudulently induced plaintiffs to deposit funds with Superior by falsely informing plaintiffs that their deposits would be insured by the Federal Deposit Insurance Corporation ("FDIC").

Plaintiffs have filed a five-count fourth amended complaint, claiming that (1) defendants violated the Illinois Consumer Fraud Act, 815 ILCS § 505/2 by "providing false financial statements regarding the financial condition of the bank and erroneous legal advice regarding FDIC insurance coverage" (Count I); (2) CCFC and E&Y violated the Racketeer Influenced and Corrupt

-1-

Organizations Act ("RICO"), 18 U.S.C. § 1962(c) by withdrawing funds from the bank under cover of false financial statements approved by E&Y (Count II); (3) E&Y violated Section 30.1 of the Illinois Public Accounting Act by knowingly or negligently approving financial statements that drastically overstated the value of Superior's assets (Count III); and (4) E&Y knowingly aided and abetted CCFC's RICO violation (Count IV). Plaintiffs have also sued the FDIC and CCFC's principals for a declaration that the FDIC's settlement of claims against CCFC should be declared null and void because the settlement attempts to divert Superior's assets to CCFC in violation of the statutory priority scheme for distribution of Superior's assets (Count V).

Before the court are separate motions to dismiss filed by the CCFC Defendants, the Bank Defendants, E&Y and the FDIC. For the reasons stated below, defendants' respective motions to dismiss are each granted.

## BACKGROUND

In resolving defendants' motions to dismiss, the court assumes that the following allegations of plaintiffs' complaint are true.

In December of 1988, Superior, which had already been taken over by federal regulators, was sold to CCFC, a holding company which, in turn, is owned and controlled by Thomas J. Pritzker, Penny S. Pritzker and Alvin Dworman. Following its takeover by CCFC, Superior began accumulating high-risk assets associated with retained interests in mortgage securitizations. The securitization process was very complex but basically worked as follows: Superior made high-risk loans to auto and home buyers with poor credit histories, pooled the loans and then sold interests in the loan pools to investors. Superior collected the income streams due on the underlying mortgages and paid a fixed rate of return to investors. Superior made money on the transaction based on the difference between the mortgage payments it took in from borrowers and the lower fixed rate of return Superior paid to the investors. This was a high-risk venture because the value of Superior's retained interests fluctuated depending on the rate of default or prepayment on the underlying loans.

For example, a high rate of prepayment by borrowers – as happens when borrowers refinance their loans due to declining interest rates – would depress the value of Superior's retained interest because Superior would no longer receive the high contractual interest rate from those mortgage debtors but would still be obligated to pay the fixed rate of return to investors.

Plaintiffs allege that, during their ownership of Superior, the CCFC Defendants essentially plundered Superior's assets by withdrawing funds from Superior far in excess of what was warranted by Superior's financial performance and engaging in myriad self-interested transactions with Superior. For example, plaintiffs allege that CCFC's principals took out vast loans from Superior that they had no intention of repaying and "helped themselves" to Superior's assets by directing Superior to pay CCFC $188 million in dividends from 1989-1999. Plaintiffs allege that defendants' fraud and mismanagement severely depleted Superior's assets and eventually drove Superior into insolvency.

To maintain the influx of cash into Superior's coffers, the CCFC Defendants and Bank Defendants hid Superior's deteriorating financial condition from depositors and prospective depositors with the help of Superior's auditors, E&Y. Plaintiffs claim that E&Y "cooked" Superior's books by vastly overstating the value of Superior's assets. Then, based on E&Y's faulty conclusions, the CCFC and Bank Defendants made statements to depositors assuring them that Superior was financially sound.

Plaintiffs also claim that, to encourage large deposits, Superior misrepresented the availability of FDIC insurance. Plaintiffs allege that Superior's employees advised them that, if plaintiffs took steps to open up multiple accounts under different names, their entire deposit would be insured by the FDIC. Plaintiffs claim that Superior's advice was false and that, consequently, plaintiffs unwittingly left large portions of their deposits uninsured just when Superior was about to implode.

Eventually, defendants' mismanagement of Superior caught up to them. Plaintiffs allege that, starting in 1998, the Office of Thrift Supervision ("OTS") and the FDIC began having serious concerns about Superior's financial condition. After further investigation, the OTS and FDIC determined that several of Superior's financial statements, that had been audited by E&Y, significantly overstated the value of Superior's assets. In January of 2001, E&Y conceded that its accounting treatment of Superior's retained interests was incorrect and agreed to reevaluate its conclusions. E&Y subsequently determined that Superior's accounts must be restated to reduce the value of Superior's retained interests by $270 million. An additional $150 million write-down followed shortly thereafter.

That drastic reduction of Superior's assets left Superior insolvent and on July 27, 2001 the OTS appointed the FDIC receiver for Superior. The FDIC transferred all insured deposits, *i.e.* deposits up to $100,000, and Superior's remaining assets to a newly chartered entity, Superior Federal. About $49 million of uninsured deposits were not transferred to the new entity but rather remained with the defunct Superior Bank. As yet, Superior does not have sufficient assets to refund those uninsured deposits.

After Superior was placed in receivership, the FDIC settled Superior's claims against CCFC's principals for $460 million – $100 million paid up front and the remaining $360 million to be paid over the following 15 years. That settlement is to be distributed, in part, to Superior's depositors according to the federal statutory priority scheme for distribution of Superior's assets. However, plaintiffs allege that the $460 million settlement will still fall short of the amount necessary to compensate uninsured depositors.

Moreover, plaintiffs allege that the settlement violates the federal statutory scheme for allocating Superior's assets. As part of the settlement, the FDIC agreed with the CCFC defendants to jointly sue E&Y for misrepresenting Superior's financial condition. The FDIC also agreed to assign the Pritzkers a percentage of any proceeds recovered by the FDIC in the E&Y suit. Plaintiffs

allege that this arrangement was designed to circumvent the statutory priority scheme by allowing Superior's owners, the CCFC Defendants, to jump ahead of Superior's depositors in claiming a share of Superior's remaining assets.

On November 2, 2002, the FDIC, acting in its corporate capacity, filed a complaint against E&Y, based on E&Y's alleged misstatements of Superior's financial condition.[1] Ostensibly, the FDIC sued in its corporate capacity to avoid an arbitration agreement between Superior and E&Y. However, the District Court dismissed the FDIC's complaint for lack of standing. Although the Seventh Circuit disagreed with the District Court's standing rationale, it affirmed the dismissal of the case, holding that, pursuant to 12 U.S.C. § 1821, "FDIC-Receiver [is] the right entity to pursue any claim against Superior Bank's accountants." *FDIC v. Ernst & Young LLP*, 374 F.3d 579, 583 (7th Cir. 2004). To the court's knowledge, the FDIC as receiver for Superior has not yet sued E&Y.

## ANALYSIS

On a Rule 12(b)(6) motion to dismiss, the court accepts all well-pleaded facts as true and draws all reasonable inferences in the plaintiff's favor. *Hernandez v. City of Goshen*, 324 F.3d 535, 537 (7th Cir.2003). A complaint will not be dismissed unless it appears beyond doubt that the plaintiff can prove no set of facts that would entitle him to relief under the law. *Id.*

I.  **Plaintiffs' RICO Claim**

The CCFC Defendants and E&Y challenge plaintiffs' standing to bring their RICO claim, arguing that the injury to depositors claimed in this count is derivative of the injury to Superior and, therefore, that the claim "belongs" to Superior's receiver, the FDIC, in the first instance.

---

[1] It is helpful to think of the FDIC as two different entities in situations like this: (1) FDIC as receiver for Superior and (2) FDIC-Corporate. As receiver for the failed bank, the FDIC acts much like a trustee in bankruptcy, marshalling the assets and legal interests of the bank and distributing its assets to creditors, including the bank's depositors. In its corporate capacity, the FDIC acts in defense of the public interest, disbursing proceeds from the FDIC's insurance fund and, if warranted, prosecuting claims for reimbursement against the failed bank's officers and directors. Unless otherwise noted, when the court refers to "the FDIC" it means the FDIC acting in its capacity as receiver for Superior.

By federal statute, when the FDIC is appointed receiver of an insolvent bank, it essentially "steps into the shoes" of that bank and assumes control of the bank's rights and assets, including certain causes of action the bank might have against other parties. Similarly, the FDIC assumes ownership of causes of action with respect to the institution that belonged to the bank's depositors. The FDIC's succession to the rights of depositors is reflected in the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") which provides that "the [FDIC] shall, as conservator or receiver, and by operation of law, succeed to (i) all rights, titles, powers, and privileges of the insured depository institution, and of any stockholder, member, *account holder*, *depositor*, officer, or director of such institution with respect to the institution and assets of the institution." 12 U.S.C. § 1821(d)(2)(A)(i) (emphasis added).

The Seventh Circuit has not directly addressed whether depositors have standing to bring a direct RICO claim against an insolvent bank's shareholders and accountants in situations like this. However, this question has been addressed persuasively by the Ninth Circuit in *Hamid v. Price Waterhouse*, 51 F.3d 1411 (9th Cir. 1995), and the Third Circuit in *Popkin v. Jacoby (In re Sunrise Sec. Litig.)*, 916 F.2d 874 (3d Cir. 1990), under substantively identical circumstances. In both *Hamid* and *Popkin*, plaintiffs were depositors of a failed financial institution who lost their deposits when the bank's assets were placed under the control of government regulators. Plaintiffs in both cases attempted to bring RICO claims against, *inter alia*, the shareholders and officers of the failed bank. Those claims were nearly identical to the RICO claim at issue here: plaintiffs in *Hamid* and *Popkin* alleged that, prior to the bank's insolvency, defendants looted the assets of the bank and misrepresented the bank's financial condition to depositors in order to attract more capital. *Hamid*, 51 F.3d at 1414; *Popkin*, 916 F.2d at 882. The *Hamid* and *Popkin* courts likened depositors to shareholders in a corporation and, in an analogy to shareholder derivative actions, held that "where the harm is to all [depositors], and the injuries claimed by the plaintiffs are not separate and distinct from those to . . . depositors generally, the RICO claim is derivative and there is no standing on the

part of shareholders or depositors to assert it." *Hamid*, 51 F.3d at 1419-20; *see also Popkin*, 916 F.2d at 880. They concluded that depositors may bring a direct claim only if the asserted injury can be separated from the injury to the institution and to depositors generally. Plaintiffs' claims in *Hamid* and *Popkin* did not qualify. The *Hamid* and *Popkin* courts dismissed plaintiffs' RICO claims, holding that the alleged harm to depositors – the inability of the banks to pay their debts as a result of defendants' deception and mismanagement – was derivative of the injury to the banks themselves, and, therefore plaintiffs lacked standing to sue directly. *Hamid*, 51 F.3d at 1419-20; *Popkin*, 916 F.2d at 882-83. The *Popkin* court determined that such RICO claims "belong" to the bank or FDIC as the bank's receiver, in the first instance. *Popkin*, 916 F.2d at 888.

The court finds that the logic of *Hamid* and *Popkin* is applicable here. In this case, plaintiffs do not allege any unique injury in their RICO count against CCFC and E&Y. Rather, the injuries alleged in plaintiffs' RICO count are indistinguishable from those suffered by Superior's other depositors: plaintiffs lost their deposits because defendants looted Superior's assets, drove Superior into insolvency and, all the while, misled investors into believing that Superior was financially stable. As in *Hamid* and *Popkin*, those injuries derive from the injury to Superior itself and, therefore, plaintiffs lack standing to bring a direct RICO claim. The RICO claim at the heart of Count II must be brought by the FDIC on depositors' behalf or through a derivative suit after unsuccessful demand upon the FDIC.

Counts II and IV of plaintiffs' complaint are, therefore, dismissed.

## II. Plaintiffs' Declaratory Judgment Action Re: The Validity Of The FDIC / CCFC Settlement

In Count V, plaintiffs allege that the FDIC's settlement with CCFC's principals should be declared void as against public policy. Specifically, plaintiffs allege that the FDIC's assignment of a percentage of Superior's cause of action against E&Y – part of the consideration for the CCFC Defendants' agreement to settle with the FDIC – is, essentially, an end-run around the statutory

priority scheme for the distribution of Superior's assets.

That claim is not ripe for decision. The essence of plaintiffs' claim in Count V is that, because it sold a portion of Superior's claim against E&Y to the CCFC Defendants, the FDIC might violate the statutory priority scheme for the distribution of Superior's assets if, at some future date, the FDIC sues and successfully recovers from E&Y. Plaintiffs ask this court to void a $460 million settlement because of that possibility. However, a lot has to happen before plaintiffs' concerns are implicated. The FDIC's suit against E&Y in its corporate capacity has been dismissed. To the court's knowledge, the FDIC has not sued E&Y in its capacity as Superior's receiver. Several scenarios could unfold at this point. The FDIC could decide to sue E&Y – an action which would likely be referred to arbitration pursuant to the arbitration agreement between Superior and E&Y. Such an action may or may not be successful. If the FDIC is successful, its recovery from E&Y might make plaintiffs whole regardless of the FDIC's assignment of a portion of the cause of action. On the other hand, if the FDIC declines to sue E&Y, Superior's depositors could demand that the FDIC pursue such an action and potentially bring a derivative action against E&Y on Superior's behalf if the FDIC refuses. *See Popkin*, 916 F.2d at 887 (holding that, after an unsuccessful demand on the FDIC to sue an insolvent bank's officers and directors, depositors may pursue a derivative action on behalf of the bank). In such a derivative action the FDIC / CCFC settlement may not even come into play.

In short, the harm that is alleged in Count V is not imminent and is contingent on future events that neither the court nor the parties can forecast. The court declines to engage in such speculation. Count V of plaintiffs' complaint is dismissed. Since no viable federal claims remain, the court relinquishes jurisdiction over plaintiffs' pendent state claims. Plaintiffs' fourth amended complaint is dismissed in its entirety. *Wright v. Associated Ins. Cos.*, 29 F.3d 1244, 1251 (7th Cir. 1994) ("[T]he general rule is that once all federal claims are dismissed before trial, the district court should relinquish jurisdiction over pendent state-law claims rather than resolve them on the merits").

## CONCLUSION

For the foregoing reasons, defendants' respective motions to dismiss are each granted.

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: September 14, 2004